**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| TAY TAY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-00501 |
| | ) | |
| JOHN BALDWIN, WARDEN JEFF | ) | Judge Nancy J. Rosenstengel |
| DENNISON, ASSISTANT WARDEN | ) | |
| WALKER, KRISTIN HAMMERSLEY, | ) | |
| SERGEANT HICKS, LIEUTENANT | ) | |
| PICKFORD, OFFICER GARRET, OFFICER | ) | |
| SORIA, LIEUTENANT CAMPBELL, | ) | |
| INTERNAL AFFAIRS OFFICER STUCK, | ) | |
| and OFFICER JOHN DOE, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff Tay Tay, by her undersigned attorneys, for her complaint against Illinois Department of Corrections Director Rob Jeffreys,[1] Warden Jeff Dennison, Assistant Warden Walker, Kristin Hammersley, Sergeant Hicks, Lieutenant Pickford, Officer Garrett, Officer Soria, Lieutenant Campbell, Internal Affairs Officer Stuck, and Officer John Doe, alleges as follows:

**INTRODUCTION**

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the Eighth and Fourteenth Amendments to the United States Constitution as well as the Americans with Disabilities Act.

---

[1] Rob Jeffreys is substituted for John Baldwin as Jeffreys is the current Director of the Illinois Department of Corrections.

2.      Plaintiff is a transgender woman currently housed in Elgin Treatment Center, a secured mental health inpatient treatment facility for people designated with a severe mental illness.  During her time in the Illinois Department of Corrections ("IDOC"), Plaintiff has been repeatedly sexually assaulted by other prisoners.  She has also been subjected to constant sexual harassment at the hands of both prisoners and IDOC staff.  As a result of the abuse she has endured, Plaintiff has experienced several mental health crises, including several suicide attempts and self-mutilation episodes.

3.      Throughout her incarceration, Plaintiff has repeatedly requested that IDOC staff keep her safe, including by transferring her to a women's prison.  IDOC officials denied Plaintiff's requests, in line with IDOC's policy and practice of housing prisoners according to their sex assigned at birth.

4.      Plaintiff is not safe in men's prisons.  Without court action, IDOC will continue to ignore Plaintiff's pleas for help and she will continue to be in grave danger.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

7.      Plaintiff is, and has been at all relevant times, an Illinois Department of Corrections prisoner.  She is currently confined at Elgin Treatment Center in Elgin, Illinois.

8.      Defendant Rob Jeffreys is the Director of the Illinois Department of Corrections ("IDOC").  As such, he was acting under color of law.  At all relevant times to the events at issue in this case, the Director maintained administrative and supervisory authority over the operations

of all prisons in Illinois.  At all relevant times, the Director promulgated rules, regulations, policies, and procedures of the IDOC.  Defendant Jeffreys is sued in his official capacity.

9.    Defendant Jeff Dennison is the Warden of Shawnee Correctional Center.  At all times relevant to the events at issue in this case, Defendant Dennison was employed by the Illinois Department of Corrections.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Dennison promulgated rules, regulations, policies, and procedures at Shawnee.  Defendant Dennison is responsible for supervising all staff and managing all operations at Shawnee.  He is sued in his individual capacity.

10.    Defendant Walker is the Assistant Warden of Shawnee Correctional Center.  At all times relevant to the events at issue in this case, Defendant Walker was employed by the Illinois Department of Corrections.  As such, she was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Walker promulgated rules, regulations, policies, and procedures at Shawnee.  Defendant Walker is responsible for supervising staff and managing all operations at Shawnee.  She is sued in her individual capacity.

11.    Defendant Sergeant Hicks, Lieutenant Pickford, Officer Garrett, and Officer John Doe are officers at Shawnee Correctional Center.  At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the Illinois Department of Corrections.  These defendants are sued in their individual capacities.

12.    Defendant Kristin Hammersley is a Licensed Clinical Social Worker at Shawnee Correctional Center.  At all times relevant to the events at issue in this case, Defendant Hammersley was acting under color of law and within the scope of her employment with the Illinois Department of Corrections.  Defendant Hammersley is sued in her individual capacity.

13.     Defendant Officer Soria is an officer at Dixon Correctional Center.  At all times relevant to the events at issue in this case, Defendant Soria was acting under color of law and within the scope of his employment with the Illinois Department of Corrections.  Defendant Soria is sued in his individual capacity.

14.     Defendants Lieutenant Campbell and Internal Affairs Officer Stuck are officers at Danville Correctional Center.  At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the Illinois Department of Corrections.  These defendants are sued in their individual capacities.

## FACTUAL ALLEGATIONS

15.     Plaintiff is a transgender woman.  Plaintiff knew she was a female from a very young age.  Around 27 years ago, she began identifying as female in places where she felt comfortable.  Despite the harassment she has received in IDOC as detailed below, Plaintiff decided to openly identify as female around ten years ago while in IDOC custody.

### Plaintiff's Experience as a Transgender Woman in IDOC Men's Prisons

16.     Since entering IDOC custody in 2002, Plaintiff has exclusively been housed in men's prisons.

17.     In 2003, Plaintiff told a nurse at Stateville that she identifies as a woman. However, she was ignored and did not receive any treatment or further evaluation.

18.     In or around 2008 or 2009, Plaintiff told a mental health professional that she identifies as a woman.  She again did not receive any treatment or further evaluation.

19.     In or around 2010, eight years after entering IDOC custody, a mental health professional finally listened to Plaintiff and recognized that she is a transgender woman.

4

20.     Since then, Plaintiff has been repeatedly diagnosed with gender dysphoria, including in 2010 by Dr. Panabella at Illinois Rivers Correctional Center, in 2012 by Dr. Adkisson at Western Correctional Center, and in 2013 by Dr. Rodos at Western.

21.     In or around 2013, three years after IDOC first recognized Plaintiff as a transgender woman, IDOC finally began providing Plaintiff with hormone therapy.  She was on hormone therapy from around 2013 until 2015.

22.     Plaintiff began having concerns about the hormones and raised these concerns with Dr. Santos.  Plaintiff has a family history of diabetes and was concerned about whether the hormones could have any effect on her risk of developing diabetes.

23.     Plaintiff also discussed her concerns about harassment with Dr. Santos.  Plaintiff told Dr. Santos that other prisoners were harassing her because she was forced to take her hormones in view of other people.

24.     Rather than address these concerns with Plaintiff, Dr. Santos decided to discontinue her hormone treatment altogether.[2]

25.     Plaintiff wants to continue hormone therapy at IDOC.  However, she is concerned about her health and safety while on hormones due to improper monitoring by medical staff and the harassment from other detainees.  The hormones caused Plaintiff's features to feminize and decreased her strength, making her a target for sexual assaults by other prisoners.  Plaintiff is primarily concerned about her safety and wants to be able to transition in an environment where she feels safe and protected.

---

[2] Plaintiff is currently pursuing legal claims for injunctive relief against IDOC for the inadequate medical treatment of her gender dysphoria and related mental health issues—this lawsuit is referenced in Plaintiff's motion to consolidate—and therefore she is not pursuing claims for medical treatment in this case.  However, the inadequacy of her medical treatment is relevant to the claims in this case, as Plaintiff's inadequately treated gender dysphoria contributes to the risk of harm she faces in a men's prison.

26.     Plaintiff has also been diagnosed with Post-Traumatic Stress Disorder ("PTSD"), anxiety, and depression by numerous other mental health professionals while in IDOC.

27.     Plaintiff suffers from crying spells, hearing voices, self-mutilation, suicidal thoughts, and attempted suicide.

28.     Plaintiff experiences intensified crying spells, hearing of voices, mood swings, hypervigilence, panic attacks, nightmares, suicidal thoughts, anxiety, depression and PTSD when single-celled or when placed on suicide watch.

29.     Plaintiff has attempted suicide in IDOC custody numerous times, including on January 23, 2013, April 18, 2013, on or about February 17, 2017, and in December 2017.  Since her December 2017 suicide attempt, Plaintiff has been put on suicide watch at least six times, including once in April 2019.

30.     Plaintiff is continuously sexually harassed by corrections officers and other prisoners because of her gender identity.

31.     Prisoners are constantly exposing themselves to Plaintiff, extorting her, groping her, and touching her inappropriately.  Plaintiff first reported this type of behavior in 2010.  She was getting harassed and assaulted so frequently that she eventually stopped reporting these actions out of fear that she would be blamed or retaliated against for reporting.

32.     Plaintiff has suffered numerous sexual assaults because of her gender identity while in IDOC custody.  One sexual assault she experienced in 2010 was the subject of another lawsuit.

33.     In June 2018 in Shawnee, Plaintiff was housed in a cell in the health care unit with six other prisoners who were all harassing her because she is transgender.  She did not have any privacy in this cell.  The other prisoners were also stealing her property.

34.     Plaintiff told Defendants Warden Dennison and Assistant Warden Walker that she did not feel safe in that cell and needed to be moved.  Defendant Warden Dennison refused to address Plaintiff's concerns.  Defendant Warden Walker refused to move Plaintiff until she picked a new cellmate.  Plaintiff explained that she did not know anyone at the prison who would want to be cellmates with her.

35.     Plaintiff also told Defendant Hammersley that she did not feel safe in this housing assignment.

36.     Out of desperation to get out of the cell with the six prisoners, Plaintiff gave correctional officers the name of another prisoner who she could be housed with.  She did not know much about this prisoner, but was desperate to get out of her current cell and feel safe.

37.     Upon information and believe, Defendants Lieutenant Pickford, Officer Garrett, Hammersley, and Assistant Warden Walker all played a role in allowing Plaintiff to be housed with this prisoner.

38.     Plaintiff and this prisoner were housed in a cell together in receiving on or around June 27, 2018.

39.     Defendant Sergeant Hicks refused to let Plaintiff and her cellmate out of their cell despite the fact that they were not on lockdown status.  Defendant Sergeant Hicks called Plaintiff derogatory and degrading names.  In response to Plaintiff asking to be let out of her cell, Defendant Sergeant Hicks told her to "shut up, fag" and "go suck a dick."

40.     Because they were not let out of their cell, Plaintiff's cellmate became aggressive and started blaming and threatening her.

41.     Plaintiff told Defendants Sergeant Hicks and Hammersley that she did not feel safe because her cellmate was being aggressive and threatening her.  These Defendants refused to do anything to help Plaintiff.

42.     The first night Plaintiff was housed with her cellmate, she told a correctional officer that she wanted a crisis team, but the officer ignored her request to see a crisis team.

43.     The following day, when she was let out of her cell to go to medical, she gave a note to Defendant Hammersley explaining that she did not feel safe being housed with her cellmate.  Plaintiff gave Ms. Hammersley the name of another prisoner so that she could be rehoused immediately.  However, Plaintiff was not rehoused.

44.     When she was back in her cell later that day, she again told Sergeant Hicks that she did not feel safe and requested to file a grievance.  He again called her derogatory names and refused to allow her to file a grievance or to let her out of the cell.

45.     Later that night, into the early hours of June 29, 2018, on the third shift around 1:00 or 2:00 am, Plaintiff's cellmate raped her.

46.     Plaintiff's cellmate put a shirt on the door to conceal the rape.  While the rape was occurring, Defendant Officer John Doe conducted a cell check.  Defendant Officer John Doe opened the cell door to tell them to remove the shirt.  When he opened the cell door, Plaintiff's cellmate jumped on the toilet to pretend like nothing was happening.  But Defendant Officer John Doe saw Plaintiff sitting on the floor naked and scared.  Defendant Officer John Doe did nothing to protect Plaintiff; rather, he just told them to remove the shirt and continued walking.

47.     After the rape in the morning on June 29, 2018, Plaintiff was removed from her cell and placed on suicide watch.

8

48.     Plaintiff called PREA to report this incident and filed a grievance.  Upon information and belief, the investigation only consisted of interviewing Plaintiff and the cellmate.  Plaintiff's PREA complaint was eventually found to be unsubstantiated.

49.     After being removed from suicide watch, Plaintiff was placed alone in the same exact cell where she was raped, forcing her to relive the trauma all over again.

50.     Plaintiff should never have been housed with the prisoner who raped her.  That prisoner had already been identified by IDOC to be a "predator" who was not allowed to be housed with vulnerable prisoners like Plaintiff.  Upon information and belief, the prisoner had been investigated for sexual misconduct just months before Defendants Walker, Dennison, Hammersley, Pickford, and Garrett approved his housing placement with Plaintiff.

51.     Plaintiff was transferred to Dixon Correctional Center on August 1, 2018.

52.     While at Dixon, Plaintiff was harassed by Defendant Officer Soria because she is transgender.  Defendant Soria made many derogatory comments towards Plaintiff, including telling her to stop talking like a girl and calling her "gay," "fag," and a "sissy."  Defendant Soria also sometimes refused to give Plaintiff her food tray.  Plaintiff filed a PREA complaint against Defendant Soria.  Based on information and belief, nothing was done to investigate these allegations.

53.     Plaintiff also talked to Internal Affairs at Dixon about filing PREA complaints because she was being harassed and groped by other prisoners.  In January 2019, the Internal Affairs Officers told Plaintiff that if she filed a PREA complaint, she would not be transferred to Graham Correctional Center and would instead be punished and placed in segregation.  The IA Officers told Plaintiff that they would investigate these allegations on their own without a formal

complaint.  Upon information and belief, the IA Officers did not investigate these allegations of harassment.

54.     On February 27, 2019, Plaintiff was transferred to Graham Correctional Center.

55.     While at Graham, Plaintiff was bullied and harassed by other prisoners, particularly when she tried to use the phone.  She was called many transphobic names.

56.     Soon after arriving at Graham, another prisoner sexually harassed and threatened Plaintiff.  He tried to force Plaintiff to have sex with him.  He was aggressive towards Plaintiff and tried to force her to come out of her cell.

57.     Plaintiff told Internal Affairs about this individual and filed a grievance.  Upon information and belief, Internal Affairs did not conduct a formal investigation.  The Officers at Graham did nothing to protect plaintiff from this prisoner or the others that were harassing her.

58.     On March 22, 2019, Plaintiff was transferred to Danville Correctional Center, where she was housed until July 25, 2019.

59.     Soon after arriving at Danville, another prisoner told Plaintiff that he wanted to have sex with her and pushed her toward the bathroom in an attempted sexual assault.  Plaintiff was able to get away from this prisoner.

60.     When Plaintiff was housed in receiving at Danville, another prisoner started to harass her, threaten her, and told her that he wanted to have sex with her.  Plaintiff complained to officers about this prisoner and told them she did not feel safe around him.  Despite Plaintiff's complaints, this prisoner was later moved onto the same housing unit as Plaintiff.  Plaintiff again told officers that the prisoner continued to harass and threaten her.  Despite knowing that he was threatening her, officers continued to allow this man to be housed on the same unit near Plaintiff for a couple of days.

61.     Officers additionally attempted to house Plaintiff with another prisoner who made derogatory statements about Plaintiff and who is transphobic.  Fearing for her safety and completely desperate, Plaintiff asked for a crisis team and was placed on suicide watch.

62.     Plaintiff filed grievances about all these incidents at Danville.  Upon information and belief, no investigation has been conducted.

63.     Plaintiff has been discouraged from filing formal grievances at Danville, despite suffering from constant and repeated harassment from other prisoners.  Defendants Lieutenant Campbell and Internal Affairs Stuck told Plaintiff that she is causing a disturbance because she is complaining too much.  These Defendants have refused to do anything to protect her from the prisoners that are harassing her.

64.     Fearing for her safety, Plaintiff has avoided going to the lunchroom for her meals for over a month.  She is terrified that if she goes to the lunchroom to eat meals, she will be attacked by the prisoners who have been threatening her.

65.     While in IDOC custody, Plaintiff has also been subjected to pervasive verbal sexual harassment by correctional officers and medical and mental health staff.  IDOC staff consistently call her derogatory names.  Some specific incidents include:

a) In February 2015 while in segregation in 5 Cell at Western, a corrections officer wrote "cocksucker" in black marker on Plaintiff's window.

b) In July 2016 at Centralia, a corrections officer placed a Styrofoam drinking cup in the window on which the following was written: "You think I'm gay, I know you're gay, you suck/love dick."  Plaintiff's PREA complaint regarding this incident was substantiated by the Warden at Centralia.

11

c) In or about September 2016 at Centralia, a corrections officer repeatedly taunted and verbally harassed Plaintiff, calling Plaintiff "his bitch," saying "you're my girl," touching her inappropriately, and asking her to strip for other prisoners. Plaintiff's PREA complaint regarding this officer was also substantiated by the Warden.

66. Correctional officers as well as medical and mental health staff, including the Defendants, exclusively refer to Plaintiff with male pronouns. This consistent misgendering is a form of harassment against transgender women.

**IDOC's Official Policy is to House Transgender Women Based Solely on Gender Assigned At Birth**

67. The medical diagnosis of gender dysphoria refers to the condition characterized by clinically significant "distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." Gender dysphoria is not a mild discomfort with one's assigned sex. Rather, it is a profound disturbance that, if left untreated or inadequately treated, can lead to severe mental anguish and the inability to function normally at school, at work, or in a relationship. The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (the "DSM-5") classifies gender dysphoria as a serious medical condition.

68. The DSM-5 lists six criteria which, when present in some combination, trigger a diagnosis of gender dysphoria. These are (i) a marked incongruence between one's gender identity and one's sex characteristics; (ii) a strong desire to be rid of one's sex characteristics because of that incongruence; (iii) a strong desire for the sex characteristics of the other gender; (iv) a strong desire to be of another gender; (v) a strong desire to be treated as another gender; and (vi) a strong conviction that one's feelings and reactions are typical of another gender. An

individual must experience two or more of these criteria for at least six months to be diagnosed with gender dysphoria.

69.     IDOC completely disregards gender dysphoria diagnoses when making housing and placement decisions.  IDOC's official policy is to house prisoners solely on the basis of their sex assigned at birth.[3]

70.     Plaintiff filed her first grievance requesting transfer to a women's prison in or around 2012.  Her grievance was denied.  Since then, she has filed multiple grievances requesting transfer to a women's prison, all of which have been denied.  She has exhausted many of those grievances, all the way to Director Baldwin.

71.     IDOC officials acted pursuant to this official policy in response to Plaintiff's request for a transfer to a women's prison.

72.     IDOC follows this policy not for any legitimate penological purpose, but rather for the purpose of avoiding potentially unfavorable publicity.

73.     The application of this policy to Plaintiff violates her right to be free from cruel and unusual punishment as well has her right to equal protection.

---

[3] Although there has been two recent instances of transgender woman prisoners being transferred to the women's division in IDOC, that occurred only after extensive litigation and entry of a preliminary injunction against IDOC.  *See Hampton v. Baldwin, et al*, No. 3:18-cv-550-NJR-RJD (S.D. Ill. Nov. 7, 2018).  In Ms. Hampton's case, the Court directed IDOC to undertake the kind of individualized housing evaluation called for under the PREA regulations.  Once IDOC undertook this evaluation, it made the obviously appropriate decision to transfer Ms. Hampton to a women's facility.  *See* Angie Leventis Lourgous, *I'm Safe Here: Transgender Woman Describes Life at Illinois Woman's Prison*, CHICAGO TRIBUNE, Jan 29, 2019.  After Ms. Hampton was transferred, IDOC agreed to transfer another prisoner, Ms. Monroe, after doing an individualized housing evaluation at the request of counsel in order to avoid another lawsuit.

**IDOC Knows That Its Policy Exposes Plaintiff to a Substantial Risk of Harm**

74.     As the National PREA Resource Center puts[4] it: "Being transgender is a known risk factor for being sexually victimized in confinement settings."  *See* National PREA Resource Center, at https://www.prearesourcecenter.org/node/3927; *see also id.* ("Q: Does a policy that houses transgender or intersex inmates based exclusively on external genitalia violate Standard 115.42(c) & (e)? A: Yes." (March 24, 2016)).

75.     Additionally, the U.S. Department of Justice's Bureau of Justice Statistics reported in 2014 that almost 40% of transgender prisoners reported sexual victimization in state and federal prisons—a rate that is ten times higher than for prisoners in general. U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12, Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates*, Dec. 2014, at https//www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

76.     The Prison Rape Elimination Act of 2003 (PREA) is a federal law that prohibits and seeks to eliminate sexual abuse and sexual harassment in prisons.

77.     Because Illinois prisons receive federal funds, IDOC is required under PREA to comply with regulations set forth at 28 CFR § 115.14 et seq.

78.     As a result of PREA and widely published studies like the ones cited above, prison administrators like Defendant Baldwin know that prisoners like Plaintiff face a serious risk of harm in men's prisons.

---

[4] The National PREA Resource Center (PRC) is a project of the U.S. Department of Justice Bureau of Justice Assistance. The PRC's aim is to provide assistance to those responsible for state and local adult prisons and jails, juvenile facilities, community corrections, lockups, tribal organizations, and inmates and their families in their efforts to eliminate sexual abuse in confinement.  *See* National PREA Resource Center, at https://www.prearesourcecenter.org/about.

79.     Under the PREA regulations, IDOC officials are required to make an individualized determination of appropriate housing when it comes to housing assignments for transgender prisoners.  The regulation states: In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety and whether the placement would present management or security problems.  28 C.F.R. § 115.42(c).

80.     PREA regulations also require IDOC officials to give serious consideration to a prisoner's own subjective views of his or her own safety.  *See* Section 115.42(d) ("A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.").

81.     Given PREA requirements and the fact that the corrections field has generated numerous, widely circulated studies regarding the high risk of sexual abuse faced by transwomen in U.S. Prisons and jails, prison administrators like Defendant Baldwin know these regulations exist to protect the health and safety of transgender prisoners.

82.     Prison administrators know that transgender prisoners like Plaintiff are at risk of harm in men's prisons and that it is necessary to follow the PREA regulations in order to ensure the health and safety of transgender prisoners.

83.     IDOC purports to comply with PREA regulations, but it has clearly not done so with respect to Plaintiff.

84.     IDOC's policy not only runs counter to PREA regulations, but it is also counter to generally professional accepted standards in the medical and mental health fields.

15

85.     The American Medical Association (AMA) has made a policy statement supporting prison housing policies that allow transgender prisoners to be placed in correctional facilities that are reflective of their affirmed gender status.

86.     As AMA Immediate Past Chair Patrice A. Harris, M.D. put it, "The problem facing the safety and health of transgender prisoners is severe and well-documented. . . . Transgender prisoners are disproportionately the victims of sexual assault, suffering higher rates of sexual assault than general population inmates." *See* American Medical Association, *AMA Urges Appropriate Placement of Transgender Prisoners* (June 11, 2018), at https://www.ama-assn.org/press-center/press-releases/ama-urges-appropriate-placement-transgender-prisoners.

87.     Further, the controlling standards of care for trans people in corrections indicate that: "Housing and shower/bathroom facilities for transsexual, transgender, and gender nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety.  Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the external genitalia may not be appropriate and may place the individual at risk for victimization.  Institutions where transsexual, transgender, and gender nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents."

88.     IDOC officials recognize that prisoners who are women have different needs than prisoners who are men.  In particular, women are more likely than men to have experienced sexual abuse or other forms of victimization in the past.  Likewise, women typically come to prison with significant trauma histories.

89.     In 2018, Illinois enacted a law that formally creates a "Women's Division" within the Illinois Department of Corrections (IDOC).  *See* 730 ILCS 5/3-2-5.5.

90.     The law requires IDOC to develop and implement "gender responsive and trauma informed" practices at prisons within the Women's Division.  IDOC officials have been implementing these practices at Illinois women's prisons through innovative training programs.

91.     For example, staff at IDOC women's prisons are trained to:

a)  "Keep in mind that gender does make a difference."

b)  "Create an environment based on safety, respect, and dignity."

c)  "Support practices and programs that promote healthy connections to children, family, and the community."

d)  "Refer issues of substance abuse, trauma and mental health issues to relevant services and appropriate supervision."

e)  "Encourage female offenders to improve themselves through educational and vocational programs."  *See* Illinois Department of Corrections, *Supervising the Female Offender* (undated).

92.     Staff is also specifically trained to address female prisoners respectfully at all times, and to use respectful titles, such as "Ms" when addressing individual prisoners.

93.     Staff also receives specialized training on how to best interact with people like plaintiff who have trauma histories (also called "trauma informed practices").

94.     IDOC requires "trauma informed practices" in women's prisons because evidence shows that those practices lead to better outcomes for women prisoners.  It leads to less conflict among prisoners and reduces the need for punishment.

95.     As the Warden of Logan Correctional Center recently described to the *Chicago Tribune*, "[T]he culture at Logan has undergone an immense culture shift recently, with staff

undergoing innovative training on strategies for working with female inmates, recognizing trauma, de-escalating conflict and working with those who are mentally ill."

96.     The Warden of Logan Correctional Center acknowledges that transgender women can be appropriately housed at Logan.

97.     The mental health program at Logan is equipped to deal with prisoners suffering from trauma disorders and gender dysphoria.

98.     Plaintiff would benefit from being housed at Logan Correctional Center.

99.     Assignment to a women's prison would not only affirm Plaintiff's gender identity, but it would put her in an atmosphere where she would be protected from ongoing assault and harassment and it would give her access to mental health services she needs to stay safe.

100.    There is no legitimate penological purpose for IDOC to refuse to house Plaintiff at a women's prison.

101.    At the same time, Plaintiff does not present a risk to other women at Logan Correctional Center.

102.    Plaintiff is not sexually attracted to women.

103.    Although Plaintiff has been convicted of violent crimes, the same is true for a significant number of cisgender women currently housed at Logan.

104.    There is no legitimate penological purpose for denying Plaintiff the benefits afforded to cisgender women.

**Plaintiff Was Transferred to Elgin Treatment Center Without Adequate Due Process**

105.    In May 2019, Plaintiff filed the instant lawsuit and a motion for a preliminary injunction that would require IDOC to transfer her to Logan.  The Court scheduled a hearing to take place on the motion on July 29, 2019.

18

106.    On or around July 22, 2019, IDOC officials informed Plaintiff that she would have to go to Menard Correctional Center in order to appear at her preliminary injunction hearing.  The anticipated transfer caused Plaintiff severe anxiety, given her past experiences of sexual violence and abuse at Menard.

107.    On or around the early morning of July 23, 2019, Plaintiff's anxiety caused her to go on crisis watch.  When seen by Alexis Joseph, a mental health professional, Plaintiff reported that she was feeling stressed out, overwhelmed, and anxious about her lawsuit.  She reported that her anxiety was a 5 out of 10.  She reported that she was frustrated with the mental health treatment she was getting and asked to be seen more.

108.    The same day, Dr. William Puga was scheduled to be deposed in this matter.  Dr. Puga is the chair of IDOC's GID committee, which had previously decided to deny Plaintiff's request to be transferred to Logan.  It was also anticipated that Dr. Puga would be called to testify at the July 29, 2019 hearing.

109.    As part of his deposition preparation, Dr. Puga called Danville Correctional Center to talk to Plaintiff's mental health treaters at Danville.  He also talked with his attorneys and the attorneys for Defendants in this case.

110.    Within a few hours, Plaintiff's counsel was informed that IDOC decided to send Plaintiff to a psychiatric hospital called Elgin Treatment Center ("Elgin") and that the Defendants were seeking to postpone the July 29, 2019 hearing.

111.    No one in IDOC asked Plaintiff whether she wanted to go to a psychiatric hospital nor did they bother to tell her about their decision until nearly 2 days later.

112.    Plaintiff did not want to go to a psychiatric hospital.

113.    Elgin Treatment Center is a small, secured mental health inpatient treatment

19

facility for individuals designated with a severe mental illness who require hospitalization.

114.    While Plaintiff requires adequate mental health care to treat her Gender Dysphoria, anxiety, and PTSD, she does not require a hospital level of psychiatric care.

115.    Under federal law as well as the Illinois Administrative Code, 20 Ill. Admin. Code Sec. 415.60, the IDOC is required to notify prisoners of their potential placement in an inpatient psychiatric treatment center and allow prisoners an opportunity to object to the placement.  If a prisoner objects to the placement, they are entitled to a hearing before being committed to the mental hospital because of the stigmatizing consequences of a psychiatric commitment and the possible involuntary subjection to psychiatric treatment constitutes a deprivation of liberty requiring due process.

116.    A prisoner should be afforded sufficient time to prepare for the hearing if they object to the transfer to the psychiatric setting.

117.    A prisoner should be allowed the opportunity to present testimony of witnesses as well as cross-examine witnesses called by the IDOC at the hearing.

118.    A prisoner has a right to an independent decision maker at the hearing.

119.    A prisoner has a right to a written statement by the fact finder as to the evidence relied on and the reasons for transferring the prisoner.

120.    A prisoners has a right to qualified and independent assistance provided by the state if necessary, which may include an attorney.

121.    IDOC staff did not notify Plaintiff of her transfer to Elgin until the late morning on July 25, 2015, right after she got off a legal call with her counsel.

122.    Plaintiff told IDOC staff that she objected to her transfer to Elgin and requested the opportunity to prepare for the hearing.  Staff denied her request to prepare for the hearing and

conducted the "hearing" on the spot.

123.    Plaintiff asked if she could call witnesses to testify on her behalf, including her lawyers.  Staff denied her request to call witnesses and to call her lawyers.

124.    Plaintiff informed staff that her due process rights were being violated, and repeatedly requested to see the Illinois regulations that require a fair hearing.  Staff denied her request.

125.    While Plaintiff was attempting to explain why she objected to her transfer to Elgin, staff were already preparing for her transfer.  The whole "hearing" lasted a matter of minutes.  Shortly after Plaintiff signed a document objecting to her transfer, staff put her on a van to Elgin.

126.    Plaintiff did not receive a written statement by the factfinder as to the evidence relied on and the reasons for transferring her to Elgin.

127.    Plaintiff arrived at Elgin in the afternoon of July 25, 2015.  Despite having both a male wing and a female wing, Plaintiff was housed on the male wing.

128.    Plaintiff is not allowed to have any of her property while there.

129.    Plaintiff is denied access to a razor and therefore cannot shave her facial or body hair.  Access to a razor so that she can remain clean shaven is necessary to treat her Gender Dysphoria.

130.    Plaintiff is denied access to female undergarments as well as female commissary items—indeed, she is denied access to all commissary items.

131.    Plaintiff has been informed that there is no transgender group at Elgin.

132.    The patients Plaintiff has observed at Elgin are extremely low functioning.  There are patients who cannot control their bodily functions, patients who are actively cutting

21

themselves, patients who are actively hallucinating, and patients who are non-communicative. Plaintiff will receive no benefit from participating in group therapy with these individuals.

133.    Since arriving at Elgin, Plaintiff has already been sexually harassed by another patient who made unsolicited sexual comments and advances towards her.  Plaintiff fears that this individual will continue to harass her, as there is no way for her to be separated from him short of locking herself in her cell all day.

134.    Plaintiff's anxiety is connected with her untreated Gender Dysphoria.  While she suffers from severe anxiety, she is not actively suicidal.  There is no justification for keeping her against her will at an intensive inpatient mental hospital.

135.    Plaintiff has been informed that she could remain at Elgin for four months.

## COUNT I – VIOLATION OF THE EQUAL PROTECTION CLAUSE
### (Fourteenth Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C § 1983)

136.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

137.    Count I is alleged against Defendant Director Jeffreys in his official capacity.

138.    In the manner described more fully above, by refusing to place Plaintiff in a woman's prison, IDOC is discriminating against Plaintiff on the basis of her gender identity in violation of the Equal Protection Clause of the Fourteenth Amendment.

139.    Plaintiff seeks injunctive and declaratory relief against Defendant Director Jeffreys in his official capacity to prevent the continued violation of her constitutional rights.

## COUNT II – VIOLATION OF THE EQUAL PROTECTION CLAUSE
### (Fourteenth Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C § 1983)

140.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

141.    Count II is alleged against Defendants Director Jeffreys in his official capacity.

142.    In the manner described more fully above, IDOC staff have continually subjected Plaintiff to verbal sexual harassment due to her gender identity that male prisoners do not endure. The verbal harassment is so pervasive and ongoing that it constitutes intentional discrimination on the basis of her gender identity.

143.    Plaintiff seeks injunctive and declaratory relief against Defendant Director Jeffreys in his official capacity to prevent the continued violation of her constitutional rights.

## COUNT III – FAILURE TO PROTECT
### (Eighth Amendment Claim for Damages and Declaratory and Injunctive Relief under 42 U.S.C. § 1983)

144.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

145.    Count III is alleged against all Defendants.

146.    Under settled United States Supreme Court authority, and in accordance with the Eighth Amendment, Plaintiff is entitled to be free from a known and substantial risk of serious harm while in the custody of the State.

147.    In the manner described more fully above, the Defendants have been and continue to be deliberately indifferent to the known and substantial risk of serious harm Plaintiff faces from both prison staff and other prisoners as a transgender woman in a men's prison.

148.    The actions of the Defendants were the direct and proximate cause of the

violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

149.    The Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Plaintiff's clearly established constitutional rights.

150.    Additionally, Plaintiff seeks injunctive and declaratory relief against Defendant Director Jeffreys in his official capacity to prevent the continued violation of her constitutional rights.

## COUNT IV – AMERICANS WITH DISABILITIES ACT ("ADA")
### (ADA claim for Declaratory and Injunctive Relief)

151.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

152.    Count IV is alleged against Defendant Director Jeffreys in his official capacity.

153.    As described more fully in the proceeding paragraphs, Plaintiff is a qualified person with a mental disability under the Americans with Disabilities Act and her disability is known to the Defendants.  IDOC staff has diagnosed Plaintiff with Gender Dysphoria.

154.    Defendants violated the ADA by discriminating against Plaintiff on the basis of her Gender Dysphoria disability, as described more fully above.

155.    Defendants violated the ADA by failing to provide Plaintiff with reasonable accommodations for her Gender Dysphoria disability.  The Defendants have denied Plaintiff the reasonable accommodation of a transfer to a woman's prison.  The Defendants are denying Plaintiff reasonable accommodations for Gender Dysphoria at Elgin.

156.    Plaintiff seeks injunctive and declaratory relief against Defendant Director Jeffreys in his official capacity to prevent the continued violation of her rights under the ADA.

## COUNT V – VIOLATION OF DUE PROCESS

**(Fourteenth Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C § 1983)**

157.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

158.    Count V is alleged against Defendant Director Jeffreys in his official capacity.

159.    As described more fully in the proceeding paragraphs, Plaintiff was not given a fair hearing before she was involuntarily transferred to Elgin, in violation of the Due Process Clause of the Fourteenth Amendment.

160.    Plaintiff seeks injunctive and declaratory relief against Defendant Director Jeffreys in his official capacity to prevent the continued violation of her constitutional rights

**COUNT VI – RETALIATION**
**(First Amendment Claim for Declaratory and Injunctive Relief under 42 U.S.C. § 1983)**

161.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

162.    Count VI is alleged against Director Jeffreys in his official capacity.

163.    As described more fully in the proceeding paragraphs, Plaintiff engaged in protected First Amendment activity by filing the instant lawsuit and seeking an injunction hearing for transfer to a woman's prison.  Plaintiff suffered a deprivation that would likely deter that First Amendment activity when Defendants required her to go to Menard in order to appear at her own hearing and when they transferred her to Elgin; and the First Amendment activity was at least a motivation factor in the Defendants' decision to take the retaliatory actions.

164.    Plaintiff seeks injunctive and declaratory relief against Defendant Director Jeffreys in his official capacity to prevent the continued violation of her constitutional rights.

## COUNT VII – UNLAWFUL POLICY AND PRATICE
### (*Monell* Claim for Declaratory and Injunctive Relief under 42 U.S.C. § 1983)

165.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

166.    Count VII is alleged against Defendant Director Jeffreys in his official capacity.

167.    The actions of the Defendants were undertaken pursuant to unconstitutional policies, practices, and customs of the Illinois Department of Corrections, described above and below, which were ratified by policymakers for the Illinois Department of Corrections with final policymaking authority.

168.    At all times material to this complaint, the Illinois Department of Corrections has interrelated *de facto* policies, practices, and customs related to transgender prisoners which included, inter alia:

> a)  improperly housing transgender women prisoners in male prisons instead of the female prisons;
>
> b)  failing to properly train IDOC employees on how to care for and interact with transgender prisoners;
>
> c)  condoning a culture of harassment and abuse of transgender prisoners in IDOC prisons;
>
> d)  failing to adequately investigate complaints by transgender prisoners related to allegations concerning PREA and other wrongdoing on the part of correctional officers.

169.    IDOC's policy is to house prisoners solely on the basis of their sex assigned at birth rather than making an individualized assessment as the PREA regulations require.  All transgender prisoners except two (as explained in footnote 2 above) are currently housed in male

prisons where they are at risk of being subjected to sexual and physical abuse.

170.    The interrelated policies, practices, and customs alleged above were well known within the IDOC.  During the relevant time period, Defendant Director Baldwin had notice of these widespread practices by employees at the IDOC.

171.    The widespread practices were allowed to flourish—and become so well settled as to constitute de facto policy of the IDOC—because governmental policymakers and authority over the same, namely, Defendant Baldwin, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

172.    The interrelated policies, practices, and customs alleged above were the direct and proximate cause of the unconstitutional acts committed by the Defendants and the injuries suffered by Plaintiff.

173.    Plaintiff seeks injunctive and declaratory relief against Defendant Director Jeffreys in his official capacity to prevent the continued violation of her constitutional rights and the rights of other transgender women in IDOC custody.

## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (State law claim for Damages)

174.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

175.    Count VIII is alleged against all the individual Defendants.

176.    The Defendants' conduct described above was extreme and outrageous.  The Defendants' actions were rooted in an abuse of power and authority, and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

177.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and

27

continues to suffer severe emotional distress.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment in her favor against the Defendants in the following manner:

1.      Adjudge and declare that the policies, practices, and conduct described in this Complaint are in violation of the rights of Plaintiff under the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as her rights under the Americans with Disabilities Act.

2.      Enjoin the Defendants from subjecting Plaintiff to the unlawful policies, practices, and conduct described in this Complaint.

3.      Order that Plaintiff be transferred to Danville Correctional Center and/or Logan Correctional Center, the female prison, and placed in general population.

4.      Order further injunctive relief necessary to address the ongoing violations suffered by Plaintiff.

5.      Retain jurisdiction of this case until such time as the Defendants have fully complied with all orders of the Court, and there is reasonable assurance that the Defendants will continue to comply in the future with these orders.

6.      Award Plaintiff compensatory and punitive damages.

7.      Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

8.      Award Plaintiff such other and further relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.


Dated: July 26, 2019

Respectfully submitted,

**TAY TAY**

By: /s/ Vanessa del Valle
    One of her attorneys

Sheila A. Bedi
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
sheila.bedi@law.northwestern.edu
vanessa.delvalle@law.northwestern.edu

Alan Mills
Elizabeth Mazur
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411
alan@uplcchicago.org
liz@uplcchicago.org


## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that she served the foregoing document upon all persons who have filed appearances in this case via the Court's CM/ECF system on July 26, 2019.

/s/ Vanessa del Valle