## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TAY TAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-cv-00501-NJR |
| | ) | |
| JEFF DENNISON, LU WALKER, | ) | |
| KRISTEN HAMMERSLEY, LARRY | ) | |
| HICKS, JERID PICKFORD, JOE | ) | |
| GARRETT, JAMIN SORIA, CHARLES | ) | |
| CAMPBELL, GREGORY STUCK, and | ) | |
| ROB JEFFREYS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Tay Tay[1] is a transgender woman in the custody of the Illinois Department of Corrections ("IDOC") currently incarcerated at Danville Correctional Center ("Danville"), a male prison facility. Plaintiff filed this action pursuant to 42 U.S.C. § 1983 claiming that because she is a transgender woman housed in a men's prison, she has been subjected to and continues to be subjected to a substantial risk of serious harm.[2]

Pending before the Court is a Motion for Preliminary Injunction filed contemporaneously with Plaintiff's original Complaint. (Doc. 2). In her Motion for

---

[1] Tay Tay is not Plaintiff's birth name; it is a shortened version of her preferred transgender name Tavia. (Doc. 111, pp. 5-6).

[2] Plaintiff also brings a claim for alleged violations of the Americans with Disabilities Act ("ADA") and a claim under Illinois state law for intentional infliction of emotional distress. (Docs. 1, 64).

Preliminary Injunction, Plaintiff seeks an order (1) directing her transfer to Logan Correctional Center, a women's prison, and (2) ensuring her protection from sexual abuse and harassment at the hands of IDOC staff and other inmates. (*Id.*).

The Court held a one-and-a-half-day evidentiary hearing on the motion for preliminary injunction, and the parties submitted deposition testimony. (Docs. 109, 114). After considering the evidence and relevant authority, the Court enters preliminary injunctive relief as set forth below, granting Plaintiff's motion in part.[3]

<u>RELEVANT CLAIMS</u>

Counts 1 through 3, contained in Plaintiff's Amended Complaint (Doc. 64), are relevant to the pending Motion for Preliminary Injunction and are set forth below:

Count 1:   Fourteenth Amendment Equal Protection claims against IDOC Director Jeffreys in his official capacity for discrimination on the basis of gender identity—refusing to place Plaintiff in a women's prison.

Count 2:   Fourteenth Amendment Equal Protection claims against IDOC Director Jeffreys in his official capacity for intentional discrimination on the basis of gender identity—IDOC staff's pervasive and ongoing verbal sexual harassment of Plaintiff due to her gender identity that

---

[3] In March 2020, the Court invited counsel to advise the Court whether the preliminary injunction issued by the undersigned in *Monroe v. Baldwin*, 18-156-NJR, or the recent settlement in a related case, *Tate v. Wexford*, 16-92-NJR, impacted any of the issues raised in the pending preliminary injunction motion or the testimony and evidence presented at the evidentiary hearing. The status reports are filed at Docs. 128 and 130. In short, Plaintiff urges that her situation has not changed at all; she continues to face the same issues, including constant threats to her physical safety and well-being. (Doc. 128). According to Defendants, Plaintiff's settlement in the 16-92-NJR case would extinguish the claims for failure to protect and ADA violations in this case—for events that occurred prior to June 19, 2018 (the date the Third Amended Complaint was filed). (Doc. 130) Defendants also believe that Plaintiff's request for a transfer to Logan Correctional Center will be addressed by the preliminary injunction in the *Monroe* case, because all transgender inmates will be reevaluated for transfer "in the near future" (but a definitive timeframe is not available due to the circumstances imposed by the COVID-19 pandemic). (*Id.*) Facts provided in these status reports will be discussed in more detail throughout this Order.

male prisoners do not endure.

Count 3:    Eighth Amendment failure to protect claim against IDOC Director Jeffreys in his official capacity and against all other Defendants in their individual capacities—known and substantial risk of serious harm Plaintiff faces from prison staff and other prisoners as a transgender woman in a men's prison.

## BACKGROUND

The Motion for Preliminary Injunction alleges the following: Plaintiff knew from a very young age that she was a female and began to openly identify female around 27 years ago. (Doc. 2, p. 1). Despite being a transgender woman, Plaintiff has exclusively been housed in men's prisons since entering IDOC custody in 2002. (*Id.* at pp. 1-2). Plaintiff has been sexually assaulted, harassed, and threatened by other prisoners and IDOC staff at every prison where she has been housed. (*Id.* at p. 2). Although she reported the sexual abuse and harassment, IDOC staff failed to protect her. (*Id.*). And, despite filing grievances and complaints pursuant to the Prison Rape Elimination Act ("PREA") at these facilities, nothing was done to protect her. (*Id.* at p. 3).

Plaintiff was transferred to Danville in March 2019, where she is currently housed. (*Id.*). Officers at Danville, including Defendants Lieutenant Campbell and Internal Affairs Officer Stuck, discourage her from filing grievances and refuse to do anything to protect Plaintiff from prisoners that are harassing and threatening her. (*Id.*).

Plaintiff's mental health has severely deteriorated because of the harassment and abuse she has experienced. (*Id.*). She has attempted suicide multiple times while in IDOC custody and has frequently been on crisis watch; most recently, she was on suicide watch

in April 2019. (*Id.*). Plaintiff has already faced serious physical and emotional injury since arriving at Danville and will continue to face a grave risk of serious injury if she remains there. (*Id.*).

<u>FACTS</u>

**Plaintiff's Testimony**

Plaintiff has been housed in male prison facilities since 2002. (Doc. 111, pp. 5-7). At the time of the hearing, she resided at Danville. (*Id.* at p. 6).[4] She has been diagnosed with anxiety disorder, post-traumatic stress disorder (PTSD), manic depression, and gender dysphoria. (*Id.*). Plaintiff has identified as a transgender woman since prior to her incarceration and lived as a woman when she felt she was safely able to do so. (*Id.*). She is not currently receiving any hormone therapy because she feels it is unsafe to transition in a men's facility. (*Id.* at p. 7). She previously received hormone therapy while in IDOC custody and found that it "decreases [her] strength" and "leaves [you] defenseless." (*Id.*). Plaintiff expressed to IDOC numerous times that she wants to take feminizing hormones but does not want to take them in an environment that would be dangerous or unsafe. (*Id.* at p. 120-123; Doc. 114-1, Exs. 4, 5, and 6).

Plaintiff described her life in the men's division of IDOC as "hell." (Doc. 111, p. 7). She has experienced sexual assaults, physical assaults, threats, extortion, and bullying. (*Id.*). She has been called derogatory names such as, "fag," "sissy," "punk," and

---

[4] The Court understands from IDOC's website that Plaintiff remains at Danville. *See* https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (last visited Apr. 26, 2020).

"geechee," on a daily basis because of her gender identity. (*Id.* at p. 8). As summarized below, she offered additional testimony describing some of the most graphic abuse she has suffered while in IDOC custody at various male facilities.

**Menard Correctional Center**

Plaintiff was housed at Menard Correctional Center ("Menard") from approximately 2002 to 2005. (*Id.* at p. 8). There, she was sexually assaulted by a corrections officer in the shower of the segregation unit. This sexual assault consisted of forced anal penetration. (*Id.* at pp. 8-9). Plaintiff testified that she did not report this assault because the officer threatened her, and she feared for her safety. (*Id.* at p. 9).

**Pontiac Correctional Center**

While incarcerated at Pontiac Correctional Center ("Pontiac"), Plaintiff was sexually assaulted by another inmate in December 2010. (*Id.*). Before she was assaulted on this occasion, she informed IDOC officials that she believed she was going to be sexually assaulted. (*Id.* at p. 10). IDOC officials responded by telling her that she was going to bring this assault on herself because of her "preferred gender" and because of how she "carried herself." (*Id.*)

After she was sexually assaulted, she reported the assault to an IDOC lieutenant and correctional officer. (*Id.*). The lieutenant told her to not complain about sexual assault when she "act(s) and carr(ies) herself like a woman in a man's facility." (*Id.*). When Plaintiff pointed out the DNA on her boxers, blood on her t-shirt, and bruises, he told her that if she kept complaining, he would take her to segregation and show her what a real

ass-kicking is. (*Id.* at pp. 10-11).

A few months later, Plaintiff filed a written grievance through IDOC's grievance process that detailed both her requests for help and the assault that occurred when IDOC staff ignored her requests. (*Id.* at pp. 11-13; Exs. 33, 34). IDOC investigated Plaintiff's grievance and found physical evidence—including the alleged assailant's DNA on her boxer shorts. (Exs. 33, 34). Despite this fact, the investigator found Plaintiff's claims of sexual assault "non-substantiated." (*Id.*). The alleged assailant told the investigator that he engaged in consensual sex acts with Plaintiff. (*Id.*). Because of this admission, the alleged assailant was disciplined for sexual misconduct. (Doc. 111, p. 14; Ex. 33, 34). IDOC took no further action to protect Plaintiff from future harm. (Doc. 111, at p. 14). When Plaintiff complained about this again in writing, she was placed in segregation on investigative status. (*Id.* at p. 15). Again, other than placing her in segregation, IDOC took no action to protect Plaintiff from future assaults. (*Id.*)

**Western Correctional Center**

Plaintiff was at Western Correctional Center ("Western") in 2012, where she was sexually assaulted by her cellmate. (*Id.* at p. 16). When she first arrived, she told IDOC staff that she had a safety concern as a transgender woman and asked not to be celled with someone bigger than her, or a gang member, but they did just that. (*Id.* at pp. 17-18). Prior to the assault, Plaintiff had an indication that her cellmate was going to sexually assault her. (*Id.* at p. 16). She reported this to a mental health professional who stated that he would tell the lieutenant about her concerns. (*Id.* at pp. 16-17). But no IDOC staff spoke

with her about her concerns. (*Id.* at p. 17). Eventually, Plaintiff's cellmate physically assaulted her and forced her to perform anal and oral sex. (*Id.* at pp. 16-18).

Plaintiff reported this assault several times to IDOC officials, but they failed to investigate the incident. (*Id.* at p. 17). Plaintiff was forced to see the man who assaulted her almost every day. (*Id.* at pp. 17-18). To her, this was like reliving the assault. (*Id.* at 17). As a result, Plaintiff attempted to harm herself. (*Id.*) The report written by IDOC staff about the suicide attempt states in relevant part that Plaintiff "tied a piece of a t-shirt around [her] neck and tied it to the bed and got on [her] knees attempting to hang [her]self." (Doc. 114-1, Ex. 36). The report further states that Plaintiff was having problems with two prisoners who "were attempting to approach [her] for sex which scared [her]" and that [she] gets "harassed" by being "approached for sex" and "threatened for being a fag." (*Id.*). After her suicide attempt, IDOC still did not take any actions to protect her from harm. (Doc. 111, pp. 18-19).

**Centralia Correctional Center**

Plaintiff was at Centralia Correctional Center ("Centralia") in July 2015. (*Id.* at p. 19). There, she was harassed in the pill line, harassed by officers, and threatened by her cellmates. (*Id.*). She filed a number of complaints concerning her cellmate's harassment including that a cellmate masturbated over her while she slept at night, that a cellmate jumped into her bed at 11:00 p.m., and that a cellmate continually threatened her because she was transgender. (*Id.* at 19-20). Plaintiff reported these issues to mental health and of these cellmates, only one was moved out of her cell—but it took IDOC about a week to

do so. (*Id.* at p. 20). Plaintiff filed a detailed grievance about her concerns with her cellmates detailing their aggression towards her and their harassment of her. (Doc. 111, p. 21, Doc. 114-1, Ex. 43). After receiving this grievance, IDOC did not put into place any procedures to make sure she had a cellmate who would not harass her. (Doc. 111, pp. 20-21).

Plaintiff also suffered harassment from corrections officers at Centralia. Specifically, in September 2016, she reported instances of Officer Bailey verbally harassing her and calling her his "bitch," and that she felt uncomfortable around him. (*Id.*, pp. 21-22). Her complaints were substantiated, but IDOC failed to take any action to prevent this type of behavior from officers. (*Id.* pp. 22-23; Exs. 14, 37). Other officers continued to verbally harass her by making derogatory jokes about being transgender, dehumanizing her by saying "look at that thing" or "what is that" and overemphasizing "Mister" when saying her name. (Doc. 111, p. 23-24).

**Shawnee Correctional Center**

Plaintiff was at Shawnee Correctional Center ("Shawnee") in April 2017, where she was sexually assaulted in her cell. (*Id.* at pp. 24-25). Prior to the assault, her cellmate had been hostile, and she told the gallery officer and mental health professional that she feared her cellmate was a threat to her. (*Id.*). IDOC took no action. (*Id.*). Plaintiff's cellmate proceeded to sexually assault her—penetrating her orally and anally. (*Id.* at p. 25; Ex. 40). After an investigation, IDOC investigators found Plaintiff's claims of a sexual assault unsubstantiated because there were no witnesses or physical evidence. (Doc. 111, p. 27;

Ex. 41). Plaintiff was housed in a two-person cell, and the only other person present during the assault was the assailant. (Doc. 111, pp. 27-28).

Plaintiff was also verbally harassed and threatened by another prisoner at Shawnee. She reported to Shawnee officials that another prisoner was coming to her cell and threatening to rape her. (Doc. 111, pp. 28-29; Ex. 38). Despite this report, IDOC took no action to protect her from harm. (Doc. 111, p. 30).

At Shawnee, Plaintiff engaged in acts of self-harm out of concerns for her own safety, including tying a shoestring around her neck. (Doc. 111, p. 30). The mental health progress notes around this time indicated that she reported high anxiety and panic following her cellmate being removed without reason, which gave others license to come to her cell and harass her. (*Id.* at pp. 30-31; Ex. 39). Following this report, IDOC did not take any actions to protect her. (Doc. 111, p. 31).

**Dixon Correctional Center**

Plaintiff was at Dixon Correctional Center ("Dixon") in September 2018. (*Id.* at p. 31). While there, she had problems with Officer Soria, who made derogatory comments to her and to another transgender woman. (*Id.* at pp. 31-32). He would single her out and refuse to let her eat. (*Id.* at p. 32; Ex. 44). After she reported this incident, IDOC did not take any actions to keep her safe. (*Id.* at p. 33).

**Danville Correctional Center**

As mentioned above, Plaintiff is currently at Danville, where, at least at the time of the evidentiary hearing, she spends most of her time in her cell. (*Id.* at p. 33). While this

isolation has negative mental health consequences, Plaintiff feels she must spend time in her cell to protect her physical safety—to stay away from hostile and threatening inmates who are transphobic or have threatened her with sexual violence and to avoid staff that might harass her. (*Id.* at pp. 33-34). When she first arrived, for example, inmates tried to lure her towards the bathroom for sex. (*Id.*). One of the inmates that attempted to lure her into the bathroom was housed with her in 1 House. (*Id.* at p. 55). Plaintiff complained to Danville officials about the inmate being housed with her. (*Id.*). Nevertheless, at the time of the preliminary injunction hearing, the inmate was still housed with her in 1 House. *Id.*

Other inmates at Danville have stolen her property, harassed her, and made comments about what they want to do to her; they say they want to have sex with her, have sex with her in the shower, and are graphic about what they want from her. (*Id.* at pp. 33-34). IDOC staff at Danville have attempted to house her with transphobic individuals who have made homophobic and threatening comments. (*Id.* at p. 34). For instance, they tried to force an inmate to be her cellmate, despite his refusals, protesting: "I'm not going to go in there with that faggot bitch," "I'm not going with that homosexual," and "I don't get down like that." (*Id.*). Plaintiff was forced to go on suicide watch to keep herself safe, and staff told her they do not care if people are making derogatory comments and that they can house her with anybody they want. (*Id.* at 34-35).

Since arriving at Danville, Plaintiff has written to Intel Flannery, Assistant Warden Larson, Warden Calloway, Ms. Easton (mental health), Ms. Joseph, Ms. Carter, and a

blanket letter to IA for help. (Doc. 111, p. 35). As a result, some of these individuals called her in for an interview, but she was never separated from the people who harassed her. (*Id.*). She has expressed concerns about her safety to Assistant Warden Larson during conversations and in letters. (Doc. 115, pp. 104-105).

Plaintiff also had problems with Lieutenant Campbell. (Doc. 111, p. 58). She filed numerous emergency grievances and numerous mental health requests about keeping him away from her for antagonizing her, harassing her, and making inappropriate comments. (*Id.* at pp. 58). He is hostile and threatening. (*Id.* at p. 59). She reported extreme anxiety, panic attacks, and feeling suicidal after talking to him. (*Id.* at pp. 58, 60, 62, 67).

After the first part of the evidentiary hearing in this case (and before the second day weeks later), IDOC moved a new cellmate into Plaintiff's cell. (Doc. 115, p. 107). Plaintiff was unaware someone would be moving into her cell; she was unable to vet him[5] and was not asked if she was previously harassed or assaulted by him. (*Id.*). Upon his moving in, he told her that he "doesn't like transgender people and who the hell would like to be celled with a transgender inmate." (*Id.* at p. 108). This new cellmate also told her that she must do her "gay shit" when he is out of the cell. (*Id.*). Plaintiff immediately attempted to tell the sergeant working that shift that her new cellmate was transphobic and getting aggressive, and that she did not feel safe, but the sergeant reportedly did not know what to do. *Id.* Ultimately, she spoke to another inmate in the Building Blocks wing

---

[5] Defendants point out that Assistant Warden Larson testified it is not normal procedure for an inmate to "vet" or choose their own cellmates. (Doc. 115, at p. 61). Normally, the placement office at the facility assigns cells and cellmates based on a variety of criteria and without input from the inmate. (*Id.*).

who helped her find other channels to get the aggressive, transphobic cellmate removed from her cell. (*Id.* at pp. 109-110). The inmate was removed within about three and a half hours. (*Id.* at p. 112). After this incident, Plaintiff remained scared because "even with all this litigation going . . . and all this . . . they still doing the same thing. They keep doing it . . . they putting [me] directly in harm's way." (*Id.* at p. 110).

Plaintiff's counsel reports that Plaintiff "saw some slight improvements in her living situation" after the preliminary injunction hearing. (Doc. 128, para. 18). She started to feel "slightly more comfortable" because she became a mentor, which allowed her to socialize in groups, and she was given a job as a laundry porter, which she enjoyed. (*Id.*) Nonetheless, she still feared for her safety. Then, for reasons unknown, in late January 2020, Plaintiff was moved to a new housing block, which caused her to lose her mentorship position and her job for a period of time. (*Id.* at para. 19). Unfortunately, Plaintiff reports that she continues to be subjected to verbal and sexual harassment, and there are multiple individuals in the new unit against whom Plaintiff has substantiated PREA complaints. (*Id.*) Plaintiff reports a continued deterioration of her mental health, including feelings of hopelessness and suicidal ideations. (*Id.* at para. 25).

## Plaintiff's Witnesses

## Charles Dent

Charles Dent, an inmate in IDOC custody, was housed with Plaintiff in 2017 at Shawnee, and again in 2019 at Graham Correctional Center ("Graham"). (Doc. 111, pp. 70-71, 76). Dent has been in IDOC custody for 37-years and has been housed at nine

different facilities. (*Id.* at pp. 75-76, 81). Dent testified that, at all nine facilities, he has observed transgender inmates being treated poorly by other inmates and staff; he has "seen a lot of transgenders get assaulted and things like that." (*Id.* at pp. 75-76, 81). In Dent's experience, the treatment of transgender inmates at IDOC facilities is "virtual[ly] the same" as far as protection is concerned. (*Id*). While at Shawnee and Graham, Dent observed Plaintiff being subjected to harassment by other inmates and staff. Those incidents, combined with his knowledge of how transgender inmates are treated at IDOC facilities, caused him to fear for Plaintiff's safety. (*Id.* at pp. 75-76). Dent also believes that Plaintiff was more of a target than other inmates because of her status as a transgender woman. (*Id.* at pp. 83-84, testifying that Plaintiff faced "sexual harassment" and "hate" because of her status as a transgender woman).

While incarcerated with Plaintiff at Shawnee, Dent heard officers call her offensive names such as: "he-she," "faggot," and "wanna-be woman." (*Id.* at pp. 70-72). He heard other inmates verbally harass her, using the same language wherever she went. (*Id.* at pp. 72-74). Dent also witnessed an inmate come up behind her and grab her behind. (*Id.* at 72). At chow, other inmates refused to stand in line for food or sit at the table with her. (*Id.* at pp. 72-73). When forced to sit with Plaintiff, other inmates would threaten her, make offensive comments, and turn their trays away from the table. (*Id.*). At church, the volunteers verbally harassed Plaintiff and tried to incite violence by saying, in front of everyone, that being gay or transgender is a sin, and that gay and transgender individuals are going to hell. (*Id.* at pp. 73-74; 82-83). At commissary, the supply staff always made

Plaintiff one of the last ones in, even if she arrived first. (*Id.* at p. 74).

Although Shawnee officials observed Plaintiff being harassed, Dent never saw staff intervene on her behalf. (*Id.* at pp. 74-75). When Plaintiff went on suicide watch in December 2017, Dent witnessed an officer respond to the situation with anger. (*Id.* at p. 75). According to Dent, the officer was irate and did not take her suicide seriously—he complained that Plaintiff was just playing a game. (*Id.*). Further, the officer allowed other inmates to go into her cell to take and destroy her property. (*Id.*).

While housed with Plaintiff at Graham, Dent observed Plaintiff being subjected to similar but less severe harassment. (*Id.* at pp. 75-77). Although one official assisted Plaintiff when she was housed with a homophobic cellmate, other staff members did not assist Plaintiff when she was being harassed by inmates. (*Id*).

**Raymond Young**

Inmate Raymond Young offered testimony about his observations of Plaintiff when he was housed with her at Danville. (Doc. 111, pp. 85-86). Young met Plaintiff around March 2019 when they were both housed in D-Wing. (*Id.* at pp. 86-87). He first saw Plaintiff in the chow hall when he was working in dietary. (*Id.* at p. 87). Another inmate working in dietary saw her come in and stated: "Look at that faggot, I should put some poison in her food and kill her." (*Id.*). Also, in the chow hall, other inmates did not want to stand in line with Plaintiff or sit at a table with her. (*Id.* at pp. 89-90). Plaintiff stopped going to chow because of the harassment. (*Id.* at p. 89).

Young witnessed other inmates harass Plaintiff wherever she went; they called her

derogatory names such as "fag" and "geechee." (*Id.* at p. 89). Young never observed an officer ticket an inmate for harassing Plaintiff, even though officers saw the harassment. (*Id.* at p. 90). Young was harassed by other inmates and called a "faggot" for spending time with Plaintiff. (*Id.* at pp. 90-91). According to him, the "culture" at Danville is that "they don't like gay people," and if you talk to a gay person, "you gay now," and you will be harassed and ostracized. (*Id.*). He further testified that, based on his observation, Plaintiff was particularly vulnerable at Danville. (*Id.* at pp. 95-96).

**Dataveon Watson**

Dataveon Watson, a prisoner at Danville, met Plaintiff around March 20, 2019, when they were housed next to each other in receiving. (Doc. 111 at pp. 97-98). Watson witnessed inmates ask to see Plaintiff's body parts (specifically her breasts) and heard inmates call her "homosexual" and "fag." (*Id.* at pp. 98-99). Later, when Watson was Plaintiff's cellmate, he witnessed other inmates stalking her in the day room, when she was on the phone, and in her cell. (*Id.* at pp. 99-100). One inmate attempted to enter Plaintiff's cell to sexually harass her, and another inmate called her names and made sexual comments. (*Id.* at 100-101). Watson was also harassed for being cellmates with Plaintiff; he was called "gay" and "faggot." (*Id.* at pp. 101-102). Because of the harassment, Plaintiff stopped going to chow and Watson feared for her safety. (*Id.*).

**Glen Austin**

Glen Austin who, at the time of his testimony, was the Warden of Logan Correctional Center ("Logan"), testified by deposition that Logan is "trendsetting" with

regard to gender responsive programming and can provide safe housing for transgender women. (Austin Deposition at 97:4-98:1). Warden Austin testified that women's prisons are generally safer than men's prisons because they have less physical violence. (*Id.* at 67:4-68:16). According to Warden Austin, there is nothing about Plaintiff that suggests she is too dangerous for placement at Logan. (*Id.* at 111:3-10). While IDOC does not currently have specific housing for trans women, Warden Austin testified that he would be willing to run a transgender wing at Logan if given the resources and direction. (*Id.* at 112:7-18).

**Dr. George Brown**

Dr. George Brown, a psychiatrist and professor of psychiatry, testified as an expert witness on Plaintiff's behalf. (Doc. 112, p. 4-5). He has specialized in transgender health since 1979. (*Id.* at pp. 4-5). He has been recognized for his work in transgender health with a Lifetime Achievement Award for Transgender Health Research from the World Professional Association for Transgender Health (WPATH), awarded in November 2018 and the Southern Trans Health and Wellness Research Award from Wake Forest in March 2019. (*Id.* at p. 5). He has worked with transgender inmates over the last 25 years at various federal and state facilities. (*Id.* at p. 6).

After reviewing Plaintiff's records and interviewing her on two occasions, Dr. Brown confirmed her gender dysphoria diagnosis. (*Id.* at pp. 6-8). He also noted that, since at least 2013, Dr. Brown reviewed Plaintiff's records and conducted two interviews with her. (*Id.* at p. 8). According to Dr. Brown, there is "no medical justification or

psychiatric justification for Plaintiff's continued placement in a men's prison and the continuation of such placement renders her at risk for serious harm and potential lifelong consequences." (*Id.*). For example, in reviewing Plaintiff's records, he noted that she has had issues with sleep, anxiety, violent nightmares, and night sweats because she does not feel safe. (*Id.* at pp. 18-19). She does poorly when isolated which increases the symptomatology of her existing diagnoses resulting in increased anxiety and depression and deteriorating mental status. (*Id.* at pp. 18-19, 24-25). He testified that her attempts to maintain a low profile and to reduce the likelihood of drawing unwanted attention to herself have a negative impact on her because she must deny her authentic self. (*Id.* at pp. 20-21).

Dr. Brown also testified that because Plaintiff is not taking hormones, her symptomatology for gender dysphoria is increased. (*Id.* at p. 15). He stated she needs to be on cross-sex hormones for treatment of her gender dysphoria, but she is not on those treatments, because being on such treatments while housed at a male facility puts her at a greatly increased risk for sexual assault and rape. (*Id.*). So, as repeatedly demonstrated during Plaintiff's incarceration at multiple IDOC facilities, she is in a double-bind situation—she cannot receive medically necessary care while housed at a male facility because doing so places her at an increased risk for sexual violence. (*Id.* at pp. 15-16). He further testified that it is inaccurate for Defendants to claim she does not want to be on hormones. (*Id.* at p. 14)

According to Dr. Brown, Plaintiff's record reflects a consistent theme of assaults

and threats to her safety within the IDOC system. (*Id.* at p. 28). While in IDOC custody, she has been housed at "no less than ten" male facilities and has reported experiencing sexual violence and harassment at all of those facilities. (*Id.*). This indicates that the threats to Plaintiff's safety are not limited to one or two facilities. (*Id.*). Rather, "it's more of a widespread systemic issue." (*Id.*). Throughout his testimony he pointed to the misgendering by staff, including mental health professionals. Dr. Brown also acknowledged that a transgender inmate such as Plaintiff could also be subjected to harassment and sexual violence at a female facility. (*Id.* at pp. 34-35). Dr. Brown emphasized, however, that the likelihood of Plaintiff "being harassed, sexually assaulted, and raped by a male inmate would be zero in a female facility." (*Id.* at p. 34).

Finally, Dr. Brown testified there is nothing in the record to establish that Plaintiff would pose a threat to women at the Logan Correctional Center. (*Id* at 36). He further stated that there is no indication in Plaintiff's records "since 2002 going forward" that she is attracted to women; nor do Plaintiff's records indicate that she is currently attracted to women. (*Id.*). He also noted that having a child is not uncommon for a transgender person. Specifically, he testified,

> It's not uncommon for people with gender dysphoria, particularly at earlier phases in their life while they are still trying to understand their gender identity to have relationships, sexual or otherwise, with same sex or opposite sex individuals, same gender or opposite gender individuals. That's not at all uncommon.

(Doc. 112, p. 12). He also explained that Plaintiff's diagnosis of pre-diabetes does not make hormone therapy contraindicated, because "it's done in the free world all the time."

(*Id.* at p. 31).

**Dan Pacholke**

Dan Pacholke, who has worked in the field of corrections for over 36 years, testified as an expert witness on behalf of Plaintiff. (Doc. 112, p. 37-3).[6] He worked in six different prisons in Washington State in various capacities including as a superintendent of three prisons. (*Id.*). He served as Deputy Director of Prisons for all security operations in Washington, Director of Prisons for all prisons in Washington, Deputy Secretary overall operating divisions in Washington State, and served a brief tenure as Secretary of the Department of Corrections. (*Id.*). From there he went on to work with New York University on innovation in Government focusing on prisons and jails. (*Id.*). He has done contract work for the National Institute of Corrections and Defense Technology Corporation. (*Id.*). Since 2018, he has worked as an independent consultant in corrections-related work. (*Id.*).

As is discussed more fully below, Pacholke offered testimony regarding his review of various IDOC records pertaining to Plaintiff and his opinions regarding Plaintiff's

---

[6] For the first time in its Proposed Findings of Facts and Conclusions of Law, Defendants attack Dr. Pacholke's opinions pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). During the evidentiary hearing, Defendants raised no objection to Plaintiff's counsel's motion to tender Mr. Pacholke as an expert witness. (Doc. 112, p. 39). Thus, the Court will not allow them to do so now. *Third Wave Tech., Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991, 997 (W.D. Wis. 2005) ("Having failed to raise a *Daubert* challenge to [the expert's] testimony at the proper time, defendant forfeited its right to try to show that [the expert] was not qualified to testify at all or on specific topics."). Moreover, the Court finds that even if a timely objection had been made, Mr. Pacholke is qualified to testify as an expert pursuant to Federal Rule of Evidence 702 and *Daubert*. Rule 702 requires that: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. Those requirements are met here. *See Stollings v. Ryobi Techs., Inc.*, 725 F3d 753, 766 (7th Cir. 2013).

safety and placement within the IDOC system.

***Testimony Regarding PREA Investigations***[7]

According to a PREA investigation dated June 30, 2016, an officer allegedly wrote "I heart penis" and "I know you are gay" on a cup. (*Id.* at pp. 42-43; Doc. 114-1, Ex. 13). The complaint was substantiated, but the officer involved was not disciplined because Plaintiff did not make a request to report it as a PREA incident. (Doc. 114-1, Ex. 13). Pacholke testified that IDOC should have disciplined the officer and "taken some measure to communicate what's appropriate . . . to a broader range of staff maybe within that unit or maybe within the institution." (Doc. 112. at p. 43).

A PREA investigation dated September 27, 2016, indicated that an officer was harassing Plaintiff and other trans prisoners by calling them "bitch" and asking them to strip and perform lap dances. (Doc. 112, p. 44; Doc. 114-1, Ex. 14). This complaint was also sustained—and Pacholke testified that based on the investigative report "nothing appears to have been done to follow-up to this." (Doc. 112 at p. 44). Pacholke further testified that "at a minimum they should have disciplined the officer involved . . . and put out reminders in written form to . . . staff." (*Id.* at p. 45).

A PREA investigation dated December 23, 2010 detailed the alleged physical assault and rape of Plaintiff at Pontiac Correctional Center. (Doc. 112, p. 46; Doc. 114-1, Ex. 15). IDOC found that the assailant had engaged in sexual misconduct with Plaintiff,

---

[7] Pacholke testified about a number of investigations IDOC conducted into Plaintiff's complaints of sexual harassment and/or assaults. These investigations are referred to as PREA investigations. (*Id.* at p. 42).

but it did not sustain a finding of sexual assault. (Doc. 114-1, Ex. 15). In connection with this investigation, Pacholke testified that, after Plaintiff's complaint was sustained, IDOC did nothing to ensure her safety. (Doc. 112 at p. 47).

A PREA investigation dated April 23, 2017 pertains to a prisoner at Shawnee Correctional Center sexually harassing Plaintiff and threatening her with rape. (Doc. 112, p. 48; Doc. 114-1 Ex. 16). IDOC found the complaint unsubstantiated because of a lack of evidence and witnesses. (Doc. 114-1, Ex. 16). After finding the complaint unsubstantiated, IDOC took no further action. (Doc. 112, p. 48). Pacholke testified that even though this incident was unsubstantiated, placed in the broader context of Plaintiff's experience at IDOC facilities, the agency should have put in place "very specific case management protocols that would enhance her safety." (*Id.* at pp. 48-49).

A PREA investigation dated June 29, 2018 at Shawnee Correctional Center concerned a complaint Plaintiff made after a prisoner forced her to perform oral sex and raped her. The rape occurred a day after she told a mental health provider that she was at risk. (Doc. 112, p. 50; Doc. 114-1, Ex. 17). IDOC found this complaint unsubstantiated due to lack of physical evidence or witnesses and did nothing as a result of this complaint. (Doc. 112, p. 51; Doc. 114-1, Ex. 17). Pacholke testified that IDOC should have transferred her "to a place that would be able to accommodate and provide for her safety in a more comprehensive manner." (Doc. 112, p. 52).

### *Testimony Regarding Facebook Posts*

Pacholke also reviewed a number of posts, located on a Facebook group called

"Behind the Walls—Illinois Dep't of Corrections." (Doc. 112, p. 76-77; Doc. 114-1, Ex. 25). In this Facebook group, individuals purporting to be IDOC employees (a group of more than 5,000 individuals) posted negative comments about transgender inmates such as "still crying like a bitch," "science tells us there's only two genders: male and female," and "why in this article do they keep calling him a she?" Other posts taken from this Facebook group (Doc. 114-1, Ex. 25) included what Pacholke characterized as "many" transphobic memes, including one that stated "Transgender: when being a regular faggot doesn't get you the attention you deserve." (Doc. 112 at p. 79). Pacholke testified that these posts "depict some strong personal feelings that are inconsistent with the department's need to manage a transgender population," are inconsistent with IDOC's mission of providing for the safety of other staff and inmates, and reflect a concerning subculture at IDOC. (*Id.* at pp. 78-80). He also suggested there should have been an investigation to determine "how high up does it go [in IDOC]." (*Id.* at p. 80).[8]

### *Testimony Regarding Transgender Care Review Committee Reports*

Pacholke testified that he reviewed four Transgender Care Review Committee ("TCRC") reports relating to Plaintiff's care and placement: (1) an April 22, 2016 committee report from Centralia; (2) an August 7, 2018 committee report from Dixon; (3) a May 7, 2019 committee report from Danville; and (4) a July 16, 2019 committee report from Danville. (Doc. 112, pp. 55-61; Doc. 114-1, Ex. 5, 9, 19, and 26). None of the reviews

---

[8] The undersigned also personally reviewed each of these posts. With only a few exceptions, they are filled with comments and memes reflecting ignorance, sexism, and racism. They include attacks on the Court and the judicial system and at times promote violence.

comported with the requirements of PREA because they did not examine Plaintiff's safety concerns, PREA Complaints, grievances, crisis watch placements, or suicide attempts. (*Id.*).

### Testimony Regarding Plaintiff's Safety and Placement

Based on his review of the records, Pacholke testified that IDOC has failed to respond appropriately to threats to Plaintiff's safety and has failed to take action that would keep Plaintiff safe. (*Id.* at pp. 40-41). Instead, they move her from men's prison to men's prison, exacerbating her safety issues while putting her at a higher risk of harassment. (*Id.*). According to Pacholke, IDOC should have given considerable weight and discussion to Plaintiff's safety concerns and should have seriously considered placing her in a women's facility. (*Id.* at pp. 41-44, 147-48). His review of the records, however, revealed that IDOC officials failed to do either of these things: "[I]t's undisputable that IDOC has diagnosed [Plaintiff] as a trans woman, she's had safety concerns at literally every institution, that she's been at all male institutions, and they have had a really difficult time trying to keep her safe . . . there should have been considerable weight and discussion given to placing her in a women's facility, which I don't see in the documents." (Doc. 112, pp. 147-148).

Pacholke further testified that, pursuant to PREA, placement decisions (1) must ensure the inmate's health and safety; (2) require some consideration of the inmate's sense of his or her own safety; and (3) should be informed by objective criteria like (such as being transgender). (*Id.* at pp. 159-60). According to Pacholke, IDOC's policy related

to caring for transgender prisoners "doesn't really describe what the committee will do and what the committee will consider as it relates to placement criteria . . . it lacks the really objective criteria that the PREA law contemplated and it doesn't memorialize any of that . . . [i]t just does not put any objective criteria around placement decisions." (*Id.* at p. 161).

Finally, Pacholke opined that Plaintiff can be safely housed at Logan even though she has functioning male genitalia through the implementation of "commonsense measures," including case management and strategies related to cellmate selection. (Doc. 112, pp. 64-65). Pacholke testified that men work at Logan as correctional officers and volunteers and as a result "there's also common-sense monitoring that you have to do from a place safety standpoint." *Id.* He also testified that he reviewed news accounts describing the transition of another male to female transgender inmate, Ms. Strawberry Hampton,[9] to Logan as "a very positive experience" from both the perspective of Ms. Hampton and the Warden. (*Id.* at p. 68; Ex. 22). He further testified that the fact that some women at Logan do not want trans woman to be housed in that facility is not relevant to a decision to place Plaintiff there. (Doc. 112, pp. 69-70). In Pacholke's words "that's like saying there are white inmates in male prisons that don't want to be around black inmates . . . there are people inside of institutions that don't necessarily always get along with each other . . . however we are in charge to manage that facility and maintain the safety of those personnel." (*Id.*).

---

[9] For additional information pertaining to this individual *see Hampton v. Baldwin,* No. 18-cv-550-NJR-RJD, 2018 WL 5830730 (S.D. Ill. Nov. 7, 2018).

**Defendants' Witnesses[10]**

**Dr. William Puga**

Dr. William Puga is IDOC's Chief of Psychiatry. (Doc. 112, p. 135). He came to IDOC in January 2018, and since August 2018, he has been the Chairperson of IDOC's Transgender Care Review Committee ("TCRC"). (*Id.* at 136). He explained that the role of the TCRC is "to review the overall care of the transgendered population within [IDOC], to oversee treatment, to ensure their treatment needs were being met, and to review . . . each individual on at least an initial basis and . . . sometimes on an ongoing basis." (*Id.* at 136). The TCRC is discussed in more detail below.

Dr. Puga testified that four transgender women have been transferred to Logan, a women's facility. (*Id.* at 138). Only two of those transfers occurred during his employment with IDOC. (*Id.*). Dr. Puga explained that with respect to those transfers, he and Dr. Reister met with the individual offender and reviewed disciplinary records, PREA records, and medical records, and then presented the information to the TCRC. (*Id.* at 138-139). He also noted that there have been "significant issues" following the transfer of these two individuals, including substantiated and unfounded PREA allegations, sexual intercourse with inmates, and intimidation. (*Id.* at p. 139). He explained that many female inmates have experienced assault or abuse in their past and often suffer from posttraumatic issues and feelings of vulnerability. (*Id.* at p. 141).

---

[10] Notably, Defendants presented no expert witness testimony to rebut that offered by Plaintiff. And, once again (this is the third multi-day evidentiary hearing the undersigned has held related to IDOC's treatment of transgender inmates), no one from IDOC attended the hearing with counsel to personally hear the testimony from fact witnesses and experts.

Dr. Puga explained that he and Dr. Reister met with Plaintiff on June 17, 2019, in order to gather information about her to present to the TCRC with respect to Plaintiff's request to transfer to Logan Correctional Center. (*Id.* at p. 146; *see* Ex. 5). They explained to her the difficulties other trans inmates had encountered after being transferred to Logan. (Id. at p. 147). They discussed that Plaintiff is not taking hormones, has a fully functioning penis, and has fathered a child. (*Id.* at p. 149). Dr. Puga and Dr. Reister found Plaintiff to be pleasant and non-threatening. (*Id.* at p. 150). They did note, however, that she was tall and masculine, with mild feminine traits. (*Id.*) During this meeting, Plaintiff expressed her feelings of rejection since being placed at Danville and the social isolation she has experienced as a result. (*Id.* at p. 152).

Dr. Puga agreed that current policies are not adequate to address the needs of the transgender population. (Doc. 115, at p. 52). Dr. Puga testified that IDOC has been "very late in the game as far as addressing the particular need for transgender individuals." (*Id.* at p. 23). Dr. Puga explained that the TCRC had a meeting during which they discussed the need "to actually have policies" for the transgender community, such as policies for commissary, transfers, gender-affirming surgery, and hormones. The result of this meeting was to schedule another meeting. (*Id.* at 21).

With respect to the Facebook posts (Ex. 25) discussed by Dan Pacholke, Dr. Puga testified that after IDOC received word of these posts (apparently after they became a part of the record in this case because it occurred after the first day of evidentiary hearing but before the second), the IDOC director reportedly sent a strongly worded email about

respecting others and acting professionally at work and on social media, or else risk discipline from IDOC. (Doc. 115, p. 25).

**Kimberly Larson**

Kimberly Larson, Assistant Warden of Operations at Danville, testified that she has had frequent interactions with Plaintiff. (Doc. 115, pp. 55-56). She described Plaintiff as comfortable and relaxed during their interactions and believes Plaintiff is comfortable talking to her about any issues she might have at Danville. (*Id.* at pp. 56-57). She testified that she tours the facility multiple times per week. She has observed Plaintiff out of her cell in the dayroom interacting with others and has seen her in line going to the yard. (*Id.* at pp. 70-71).

Shortly after her arrival at Danville, Plaintiff was placed in the Building Blocks wing, which is more of a community-based program, it is structured, and has a calmer atmosphere. (*Id.* at pp. 58-59). The Building Blocks wing is a programming wing where they conduct groups and classes on the wing. (*Id.*) Plaintiff is participating in conflict resolution and is a mentor in the program. (*Id.* at pp. 69-70). Typically, there is an application process to be placed in the Building Blocks wing, but Plaintiff was placed there after an interview with an Intel officer and was not required to go through the application process. (*Id*. at p. 59)

When finding an appropriate cellmate for Plaintiff, they allowed her to provide a list of names and then placement and intel screened the individuals. (*Id.* at pp. 59-60). This is not normal procedure; they do not typically allow an offender to provide a list of

potential cellmates. (*Id.* at pp. 61, 67). Plaintiff is classified as a vulnerable inmate, which limits her potential cellmates. (*Id.* at p. 60). She would not be celled with anyone labeled a predator. (*Id.*). Plaintiff was placed with Dataveon Watson, an individual that was on her list. (*Id.* at p. 61). Eventually Watson had an incident on the wing and was removed. (*Id.* at p. 62). Plaintiff provided a list of three potential cellmates but none of them worked out. (*Id.* at p. 62-63). At the time of the hearing, they were still trying to find a suitable cellmate for Plaintiff. (*Id.* at p. 63). She also testified, however, that she has done nothing to independently identify appropriate cellmates for Plaintiff. (*Id.* at p. 76).

Plaintiff has written letters to Larson about various issues. (*Id.* at pp. 63-66). In a letter to Warden Calloway dated July 9, 2019, Plaintiff stated she did not know who was calling about her being in danger and that, at this moment, she had no immediate safety concerns. (*Id.* at pp. 65-66). The letter also stated, "I've already discussed with you how I feel about trans in a male facility." (*Id.* at p. 66). Plaintiff has expressed concerns in general about safety but "nothing that was actually happening, just that could happen." (*Id.*). Larson has not seen any interactions with Plaintiff and other inmates or staff members that caused her concern. (*Id.* at pp. 66-67).

Assistant Warden Larson testified that she spends more time with Plaintiff than she does with any of the other inmates at Danville. (Doc. 115, p. 82). Assistant Warden Larson describes the level of care that has been provided to Plaintiff as above and beyond to address Plaintiff's concerns. (*Id.*). But she also testified that there has not been a formal, individualized process established to allow Plaintiff to voice her security concerns

directly to her. (*Id.* at pp. 79-80).

In another letter, Plaintiff expressed concerns about Lieutenant Campbell and stated it would be best if she did not have to speak with Lieutenant Campbell. (*Id.* at p. 73). Although Lieutenant Campbell is the IA investigator responsible for investigating any complaints made by Plaintiff, Larson did not take any action to address Plaintiff's discomfort with him. (*Id.* at pp. 73-74). Plaintiff also stated in that letter that as a trans inmate she felt it would be best for her to be in a female facility. (*Id.* at p. 74). Larson did not take any action in response to that issue because Plaintiff had verbalized the issue before and understood that was not within Larson's control. (*Id.*).

**Sergeant Thomason**

Sergeant Thomason is the "five days a week" sergeant of the zone Plaintiff is housed in. (Doc. 115, pp. 85-91). Thomason observes and interacts with Plaintiff on nearly a daily basis. (*Id.* at pp. 92-93). Plaintiff is housed in R1-B wing. (*Id.* at p. 91). R1-B wing is a Building Blocks program wing. (*Id.* at p. 87). Inmates in R1-B are allowed additional time outside of their cell and more programing than other wings at Danville. (*Id.* at p. 88). He considers R1-B to be a safer housing unit and not an aggressive unit. (*Id.* at pp. 90-91). Plaintiff participates in group programming. In fact, Plaintiff is a "mentor" for the Building Blocks program and has been working on creating her own Building Blocks class on diversity. (*Id.* at pp. 92, 95-96, 101).

Thomason has observed and interacted with Plaintiff while she was outside of her cell. (*Id.* at pp. 92-93). Plaintiff interacts and talks regularly with inmates outside of her

cell. (*Id.*). Thomason has not observed or heard any interactions, situations, or conduct that would indicate Plaintiff's safety is compromised. (*Id.* at p. 93). Thomason has not received any reports or information from other staff members that would indicate Plaintiff is at risk of harm. (*Id.*). Plaintiff has not expressed any safety or security concerns to Thomason. (*Id.*).

Thomason testified that his interactions with Plaintiff are good natured. (*Id.* at p. 92). Thomason has testified that if he was told of or observed any hostile or unsafe situations, he would immediately remove Plaintiff from the situation and ensure that a prompt investigation was conducted. (*Id.* at pp. 97-98).

Sergeant Thomason testified he considers Plaintiff to be a man because she is in a male institution. (Doc. 115, p. 99). Despite his alleged daily interaction with Plaintiff, he testified he was unaware she preferred "she" and "her" pronouns until this hearing. *Id.* He further testified that Plaintiff may have had issues on the block that were never brought to his attention.[11] (*Id.* at p. 100).

**Dr. Shane Reister**

Dr. Shane Reister is currently employed by IDOC as the Southern Regional Psychologist Administrator and is a member of the TCRC. (Reister Dep. 10:1-16). Dr. Reister is also a World Professional Association of Transgender Health (WPATH) member. (Reister Dep. 11:8-15). Dr. Reister occasionally conducts interviews for the

---

[11] Plaintiff testified that she would not have brought any safety concerns to Sergeant Thomason because she "doesn't have a rapport with him" and because he mentioned to her that the Bible states "being a homosexual is an abomination." (Doc. 115, p. 106).

TCRC so that he can provide additional reports and perspectives for the TCRC to consider. (Reister Dep. 12:22-25). Additional points of Dr. Reister's testimony as it relates to the TCRC and its decision regarding Plaintiff are discussed below.

Dr. Reister believes that as long as Plaintiff is approved for outpatient treatment, she is appropriately placed at Danville in the Building Blocks units. (Reister Dep. 168:1-9). Based on his experience, Dr. Reister indicated that he would expect there to be a higher risk of sexual harassment towards Plaintiff by female inmates in the female division. (Reister Dep. 170:21-25).

**Dr. Steven Meeks**

Dr. Steven Meeks is the Chief of Health Services for IDOC. (Meeks Dep. 10:16-21). In his position as Chief of Health Services, Dr. Meeks does not provide any direct medical care to offenders in IDOC custody. (*Id.* at pp. 10:22-11:2). Dr. Meeks is also a member of the TCRC and was, at one time, the facilitator of the TCRC. [12] (*Id.* at pp. 13:10-17).

Dr. Meeks conceded that in March 2017 and July 2019, there was no committee member who he personally recognized as an expert in the provision of care and services to people who are transgender. (*Id.* at *pp*. 105-106, 133-134). He testified that the TCRC did not document recommendations about Plaintiff's safety concerns, but it may have discussed them. (*Id.* at pp. 131, 136). Dr. Meeks affirmed that the TCRC records do not show that they considered grievances or PREA in making their decisions on treatment and support. (*Id.* at pp. 50, 64, 75, 100). Dr. Meeks further conceded that the TCRC's record

---

[12] Previously known at the Gender Identity Disorder Committee. (Meeks Dep. at 39).

related to Tay Tay's safety is "incomplete." (*Id.* at 131).

**IDOC's Transgender Care Review Committee**

IDOC has in place an administrative directive establishing a Transgender Care Review Committee ("the TCRC") that is charged with "reviewing placements, security concerns, and overall health related plans of transgender offenders and offenders diagnosed with gender dysphoria and overseeing the gender related accommodations for these offenders." (Doc. 114-1, Ex. 18; Reister Dep 10:16-21). The TCRC at the site is comprised of an administration representative, a medical representative, and a Mental Health Department representative. (Reister Dep. 10:23-11:1). The TCRC creates a multidisciplinary plan for the care and safety management and medical needs of transgender offenders. (Reister Dep. 11:1-4).

### *The TCRC's Reviews of Plaintiff*

On June 17, 2019, Dr. Puga and Dr. Reister met with Plaintiff to discuss placement in response to her lawsuit requesting transfer to IDOC's female division. (Doc. 112, pp. 145-146; Doc. 114-1, Ex. 5). They explained to her that it would be a committee decision. (Doc. 112, p. 146). They talked to her about her expectations and about "the realities that some things may not be as easy and the women there have not been very welcoming and so that if she were to go [to Logan] that she may have to experience some of the same stressors and some of the same resistance that the other transgender females have felt." (*Id.* at p. 147).

On July 16, 2019, the TCRC met to discuss Plaintiff's placement and whether she

should be transferred to Logan. (Doc. 115, p. 5). Dr. Puga provided them with a review of the interview he and Dr. Reister had with Plaintiff and Plaintiff's disciplinary records. (*Id.* at p. 5-6; Ex. 26).

The TCRC discussed the fact that the two transgender women that were transferred to Logan have dealt with resistance, a hostile environment, and PREA allegations against them. (Doc. 115, pp. 8-9). The TCRC also discussed the fact that Plaintiff being tall and muscular would be intimidating to the women at Logan. (*Id.* at pp. 9-10). They discussed the fact that there are women in Logan that have been abused by males that are stronger, taller, and bigger than they are. (*Id.* at p. 10).

The TCRC discussed Plaintiff's feelings of some animosity from different groups at Danville and that she at times feels rejected at Danville. (Doc. 115, p. 12). They also noted that Plaintiff is relatively stable and not in a threatening place. (*Id.* at p. 12). They noted that Plaintiff's placement at Danville has been going fairly well and a disruption of this placement could be problematic. (*Id.* at pp. 12-13). Dr. Puga also testified that he is expecting a transgender group therapy to be developed and started soon at Danville. (*Id.* at pp. 25-16).

The TCRC also discussed the fact that Plaintiff is not currently on hormones and is able to maintain an erection. (Doc. 115, p. 17). They discussed the prior significant sexual behaviors between the transgender women and women at Logan. (*Id.* at p. 17-18). Dr. Puga testified that some of the women at Logan have been very sexually provocative towards the transgender women at Logan. (*Id.* at p. 18). Dr. Puga testified that these

factors all have to be considered in deciding whether to transfer an inmate and trying to figure out how best to create a safe environment. (*Id.*). After reviewing all of the factors as a whole, the TCRC decided that Plaintiff would not be transferred to Logan. (*Id.* at p. 19).

When the TCRC reviewed Plaintiff's care and placement on July 16, 2019, Dr. Puga and Dr. Reister reported that Plaintiff told them about the constant misgendering, harassment, and sexual assaults that occurred in IDOC custody. *Id.* at p. 294. She also reported forced isolation, and that she wanted a transfer to Logan primarily for security, but also to receive treatment for her gender dysphoria, PTSD, and general mental health. (Doc. 114-1, Ex. 5; Doc. 115, pp. 295-296. The committee unanimously voted against transfer to Logan, but it did not discuss alternatives to keep Plaintiff safe. (Doc. 114-1, Ex. 26; Doc. 115, pp. 285, 296-297). The committee's decision appears to have been largely informed by the fact that she has "functioning male organs" and that she is not taking hormones. Notably, it did not address the fact that Plaintiff refuses hormones because of her safety concerns. (Doc. 115, p. 17; Doc. 114-1, Ex. 5).

***Transgender Policy Committee***

At the evidentiary hearing, Dr. Puga testified that IDOC has decided to create a Transgender Policy Committee ("TPC"). The TPC will be responsible for reviewing, adapting, and creating comprehensive policies concerning IDOC's care, custody, and control of transgender inmates. (Doc. 115, pp. 20-22). Dr. Puga testified that the TPC will be addressing policies related to commissary, hormones, surgery, transfers, strip-

searches, and other issues. The TPC will include input from experts. The TPC hopes to establish policies that result in uniform outcomes and provide more certainty. Dr. Puga also testified that he hopes to develop more progressive policies for transgender offenders. The goal of the TPC and IDOC is to continually adapt their processes to make the safest and best environment for all inmates in their custody. These efforts will accomplish this goal and will also allow for continued respect for the many minority communities, including the LGBTQ+ community, found within IDOC. Dr. Puga believes that a voluntary unit within IDOC for its LGBTQ+ population would be an appropriate and ideal goal to set for IDOC. (Doc. 115, p. 54). As of the date of entry of this Order, however, the Court is unaware what, if any, steps towards these goals have been completed.

## LEGAL STANDARDS

A preliminary injunction is an extraordinary and drastic remedy for which there must be a clear showing that Plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The purpose of such an injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). In the Seventh Circuit, "a district court engages in a two-step analysis to decide whether such relief is warranted." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008)). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief,

the movant will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) the movant has a reasonable likelihood of success on the merits." *Id.* (citing *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086; *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). In the second phase, the court must weigh the balance of harm to the parties if the injunction is granted or denied and also evaluate the effect of an injunction on the public interest. *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1054 (7th Cir. 2017); *Turnell*, 796 F.3d at 662.

The Seventh Circuit has described injunctions like the one sought here, requiring an affirmative act by the defendant, as a mandatory preliminary injunction. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Mandatory injunctions are "cautiously viewed and sparingly issued," because they require the court to command a defendant to take a particular action. *Id.* (citing *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978)).

The Prison Litigation Reform Act ("PLRA") applies to suits filed by incarcerated individuals and limits the equitable relief a district court can order. 42 U.S.C. § 1997e; 18 U.S.C. § 3626. "The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a). "When determining whether these requirements are met, courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.* (internal quotations omitted).

Finally, "federal courts, while most reluctant to interfere with the internal administration of state prisons . . . nevertheless will intervene to remedy unjustified violations of those rights retained by prisoners." *Williams v. Lane*, 851 F.2d 867, 871 (7th Cir. 1988); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (courts generally do not interfere with prison administrative matters in the absence of constitutional concerns). Thus, while courts usually hesitate to interfere with a routine transfer of an inmate from one prison to another, when an inmate's constitutional rights are at issue, a district court can intervene.

## DISCUSSION

In light of the evidence presented at the evidentiary hearing and the entire record, the Court makes the following findings of fact and conclusions of law.

### *Likelihood of Success on the Merits*

Likelihood of success requires only a "better than negligible" chance of succeeding on the merits. *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018) (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). "[T]he threshold for establishing likelihood of success is low." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011). Plaintiff contends she will succeed on the merits because Defendants have: (1) violated the Equal Protection Clause by housing her in a men's facility; (2) violated the Equal Protection Clause by constantly sexually harassing her; and (3) violated the Eighth Amendment by failing to protect her from sexual abuse and harassment.

**Equal Protection**

The Equal Protection Clause of the Fourteenth Amendment directs that "all persons similarly situated should be treated alike." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1050 (7th Cir. 2017). "It therefore, protects against intentional and arbitrary discrimination." *Id.* And, at the very least, the Equal Protection Clause prohibits state action that lacks any purpose other than a "bare ... desire to harm a politically unpopular group[.]" *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). "Generally, state action is presumed to be lawful and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest." *Whitaker*, 858 F.3d at 1050. The rational basis test does not apply, however, when discrimination is alleged based on one's membership in a protected class. *See Flynn v. Thatcher,* 819 F.3d 990, 991 (7th Cir. 2016) (when "disparate treatment is not based on a suspect class and does not affect a fundamental right" prison conduct must be rationally related to a legitimate penological interest). In those situations, heightened scrutiny applies. *Whitaker*, 858 F.3d at 1050.

Neither the Seventh Circuit nor the Supreme Court has determined whether transgender individuals constitute a protected class. *Id.* at 1051 ("[T]his case does not require us to reach the question of whether transgender status is per se entitled to heightened scrutiny."). Other district courts outside the Seventh Circuit, however, have recognized transgender individuals as either a suspect or quasi-suspect class are entitled to heightened scrutiny. *See, e.g., Bd. of Educ. of the Highland Local Sch. Dist. v. United States*

*Dep't of Educ.*, 208 F. Supp. 3d 850, 872-74 (S.D. Ohio 2016) (concluding that heightened scrutiny applied to equal protection claim arising from a transgender girl being denied access to the girls' bathroom because transgender individuals are a quasi-suspect class).

Even where trans people have not been found to constitute a protected class, the Seventh Circuit has held that heightened or intermediate scrutiny applies when the complaint is based on sex discrimination. *Whitaker*, 858 F.3d at 1050 (a sex-based classification is subject to heightened scrutiny, as sex "frequently bears no relation to the ability to perform or contribute to society") (citations omitted). Under intermediate scrutiny, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to be upheld. *Craig v. Boren*, 429 U.S. 190, 197 (1976). "When a sex-based classification is used, the burden rests with the state to demonstrate that its proffered justification is 'exceedingly persuasive.'" *Whitaker*, 858 F.3d at 1050 (citing *United States v. Virginia*, 518 U.S. 515, 533 (1996). "It is not sufficient to provide a hypothesized or *post hoc* justification created in response to litigation." *Id.*

**Discrimination**

The record is clear that IDOC houses inmates, by default, in the prison of their gender assigned at birth.[13] Thus, a sex-based classification is used, and intermediate scrutiny will be applied. "Under intermediate scrutiny, the question becomes: is IDOC's

---

[13] Defendants argue that this is untrue because several transgender women have been transferred to women's facilities. (Doc. 104, p. 10). But the record establishes that those transfers have come about only after an initial placement based on the inmate's gender assigned at birth. (*See* Doc. 112, p. 138; Doc. 115, p. 26).

policy of placing transgender inmates in the prison of their assigned sex at birth substantially related to the achievement of prison security?" *Hampton v. Baldwin,* No. 18-cv-550-NJR-RJD, 2018 WL 5830730, at *11 (S.D. Ill. Nov. 7, 2018).

Here, Plaintiff has shown a likelihood of success on the merits of her equal protection claim. PREA's operative regulations and IDOC's own relevant policies provide that housing decisions should not be made solely on the basis of genitals. (Doc. 101, p. 5; Doc. 114-1, Exhibits 12, 18)). And the Court is concerned that IDOC puts so much weight on Plaintiff's physical size alone in determining her placement, which is nonsensical. There is no evidence before the Court to suggest that IDOC would automatically assign a very small man to a women's prison—or an exceptionally large woman to a men's prison—based on that individual's size alone. People obviously come in all shapes and sizes, and the Court is troubled that IDOC gave such heavy consideration and used Plaintiff's physical size as one of its main reasons why it would not transfer her to a women's facility.[14]

And, of course, Plaintiff's size relates to another factor on which IDOC hangs its hat. IDOC seems to suggest that Plaintiff is somehow not truly transgender because she has refused hormone therapy. (Doc. 104, p. 9; Doc. 112, p. 62). But the Court understood

---

[14] This argument is based solely on sex stereotyping. IDOC argues that because Plaintiff was classified as a male at birth, she will pose a unique risk of harm to the women at Logan. This discriminatory logic assumes that Plaintiff poses risks that other women at the facility do not, which is based entirely on the fact that she is a trans woman. The parties agree that: (1) violent women are housed at Logan; (2) women who are larger than average are housed at Logan; and (3) women disliked by other women are housed at Logan. Thus, basing Plaintiff's housing determination on any of these factors amounts to unlawful discrimination.

quite clearly from Plaintiff and her expert witnesses that she has so far refused hormone therapy simply because she thinks it would make her more susceptible to abuse while housed at a male prison. (Doc. 111, p. 7; Doc. 112, p. 14). And, of course, if Plaintiff was able to take hormone therapy without fearing for her safety, IDOC's concern about her functioning male anatomy would no longer be an issue. Plaintiff testified that she identifies as female, but she is not sexually attracted to women, a factor which IDOC seems to not have considered.

The Court is also troubled that IDOC points to the difficulties the other inmates have experienced or caused when transferred to a women's facility. But this falls far short of an individualized determination for Plaintiff. She of course had nothing to do with those incidents. And if a gender-assigned female had an issue at a women's facility—whether that was a physical fight or an inappropriate or illegal sexual act—would IDOC consider a transfer of that individual to a men's facility?

The IDOC Transgender Care Review Committee has met about Plaintiff on numerous occasions—ostensibly to consider whether IDOC is meeting Plaintiff's needs as a trans woman in custody. The documents reflecting those meetings indicate that the committee focused on Plaintiff's "functioning male organs" and the fact that *other* trans women had "significant problems" at Logan. During the other meetings, the committee never considered whether Plaintiff should be housed in the Women's Division of IDOC. These are the precise kind of generalized concerns for prison security that courts routinely object. *See, e.g., Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 WL 2994403, at *10

(D. Mass. June 14, 2018) ("generalized concerns for prison security are insufficient to meet the 'demanding' burden placed on the State to justify sex-based classifications.")(citing *United States v. Virginia*, 518 U.S. 515, 531 (1996)).

Based on the evidence, IDOC's decision to house Plaintiff in a men's facility is not based on any legitimate penological purpose. Assignment to a women's prison would not only affirm Plaintiff's gender identity, but it would put her in an atmosphere where she would be protected from ongoing sexual assault and harassment, and it would give her access to the mental health services she needs to stay safe. Glen Austin, the former warden of Logan, has publicly acknowledged that transgender women can be appropriately housed there. Regarding Strawberry Hampton, the transgender woman who was transferred to Logan, the former warden stated he "believes living in an environment of women, with programming catered to those gender differences, will provide an opportunity for her to excel." (Doc. 114-1, Exhibit 22). In addition, the mental health program at Logan is equipped to deal with prisoners suffering from trauma disorders and living with gender dysphoria. *Id.* ("Logan has undergone an immense culture shift recently, with staff undergoing innovative training on strategies for working with female inmates, recognizing trauma, de- escalating conflict and working with those who are mentally ill.").

Although Plaintiff has been convicted of violent crimes, the same is true for a significant number of cisgender women currently housed at Logan. Accordingly, Defendants will likely not be able to establish that Plaintiff's placement in a men's prison

is substantially related to an important government interest. *See Hampton*, 2018 WL 5830730, at *12 (finding that a transgender female inmate's equal protection claim based on her placement in a men's prison had a "greater than negligible chance of success on the merits"); *Mass. Dep't of Corr.*, 2018 WL 2994403, at *9 (refusing to dismiss transgender woman prisoner's equal protection claim because "[t]he court agrees with Doe that for present purposes the DOC has not met its burden of demonstrating that housing her and other similarly-situated transgender prisoners in facilities that correspond to their birth sex serves an important governmental interest"); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1120 (N.D. Cal. 2015) (finding that a transgender woman prisoner adequately stated equal protection claim against prison officials for denying her sex reassignment surgery); *Mitchell v. Price,* No. 11-cv-260-wmc, 2014 WL 6982280, at *11-12 (W.D. Wis. Dec. 10, 2014) (denying summary judgement on a transgender woman prisoner's equal protection claim against an officer who transferred her back to a block where she encountered taunts and threats).

### Sexual Harassment

Plaintiff next argues that Defendants have violated the Equal Protection Clause by intentionally subjecting her to verbal and physical sexual harassment that male inmates do not endure because she is a transgender woman. To succeed on her sexual harassment claim under the Equal Protection Clause, a plaintiff must establish (1) the harassment was intentional and based on sex and (2) the harassment was "sufficiently severe or pervasive[.]" *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990). "[A] plaintiff wishing

to sustain an equal protection claim of sexual harassment must show both 'sexual harassment' and an 'intent' to harass based upon that plaintiff's membership in a particular class of citizens[.]" *Id.*

The evidence establishes that Plaintiff has been subject to frequent and ongoing harassment based on her gender identity, including during her current placement at Danville. Prisoners and correctional officers call her derogatory names such as "fag," "faggot," "bitch," and "cocksucker," and threaten her with rape and sexual assault and more. In addition, correctional and medical staff constantly misgender Plaintiff, referring to her as "mister" and using male pronouns even though they are aware that she is a transgender woman.[15] The sexual harassment that Plaintiff experiences is so severe and pervasive that it rises to the level of a constitutional violation. *See Hampton*, 2018 WL 5830730, at *12 (finding transgender woman's equal protection claim based on sexual harassment in a male prison was likely to succeed on the merits where prisoners and correctional officers constantly misgendered her and verbally abused her with slurs such as "fag," "it," "he-she", and "dick-sucker"); *Owens v. Ragland*, 313 F. Supp. 2d 939, 944-47 (W.D. Wis. 2004) (denying summary judgement on plaintiff's equal protection claim where city official made sexually explicit comments and proposals to plaintiff); *Joyner v. Snyder*, No. 06-3062, 2007 WL 401269, at *2 (C.D. Ill. Feb. 1, 2007) (finding that prisoner sufficiently stated an equal protection violation where prisoner alleged that he was

---

[15] It troubles the Court that even Dr. Puga, IDOC's Chief of Psychiatry, at times referred to Plaintiff during his testimony as "him" and "he" — a blatant example of the misgendering Plaintiff complains about. (Doc. 112, p. 144).

harassed and discriminated against because of his sexual orientation).

Unfortunately, it appears this harassment has continued after the evidentiary hearing in this case. In her recent status report, Plaintiff reports that she has written approximately five letters to Warden Larson asking for help but has not received a single response. (Doc. 128, p. 9). This has apparently emboldened staff to bully her and to taunt and antagonize her about this case, including an alleged statement by Lieutenant Campbell that the undersigned must like her at Danville since this ruling had not been issued. *Id.* This is indeed unfortunate.[16]

Again, Defendants seem to assert the defense the undersigned saw in *Hampton*—all IDOC inmates are subjected to harassment, and so a transfer would not eliminate the harassment. In other words, something along the line of "none of our staff acts professionally, so a transfer would not remedy the issues alleged." (Doc. 104, p. 5-6). Specifically, Defendants argue that Plaintiff has failed to show that the staff members and/or inmates at Logan will be any kinder than staff members and inmates elsewhere. *Id.* But again, that puts the cart before the horse, as Defendants have not even provided an individualized determination about what placement is appropriate for Plaintiff. As the undersigned noted in *Hampton*, the Court is not blind to the fact that male inmates also face sexual and verbal harassment from other inmates and staff, but there is no

---

[16] The recent status report also indicates that Plaintiff was moved to a new housing block in late January 2020, which caused her to permanently lose her position as a mentor and temporarily lose her job as a laundry porter. She claims she is now housed with multiple individuals against whom she has previously filed PREA complaints, and she continues to face verbal and sexual harassment. She was also blocked from enrolling in a bible college program at Danville because of her gender identity. (Doc. 128, p. 9).

evidence that such abuse rises to the same level Plaintiff has experienced. *Hampton,* 2018 WL 5830730, at *12.

For these reasons, Plaintiff has a likelihood of success on the merits of her equal protection claim with regard to verbal and physical sexual harassment.

### Failure to Protect

Prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners," *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citations omitted), and, by extension, correctional officers. "Omissions can violate civil rights, and 'under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983.'" *Chavez v. Ill. State Police*, 251 F.3d 612, 652-3 (7th Cir. 2001) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

To succeed on such a claim, an inmate must first demonstrate she is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Second, the inmate must show prison officials acted with deliberate indifference to that risk, which requires a subjective inquiry into a prison official's state of mind. *Id.* at 838-39. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk or serious harm exists, and he must also draw the inference." *Id.* at 837.

A prisoner may demonstrate that prison officials were aware of a specific, impending, and substantial threat to her safety "by showing that [s]he complained to prison officials about a specific threat to [her] safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th

Cir. 1996) (quoting *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991)). The prison official may be held liable only if he knows an inmate faces a substantial risk of serious harm and "disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. A plaintiff also "can establish exposure to a significantly serious risk of harm by showing that [s]he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates." *Id.* at 843 (quotation omitted).

The sexual abuse and harassment that Plaintiff has suffered in IDOC custody constitutes "serious harm." *See Farmer*, 511 U.S. at 833-34 (treating sexual assault as serious harm); *Brown v. Budz*, 398 F.3d 904, 910-11 (7th Cir. 2005) (finding that a "beating suffered at the hands of a fellow detainee . . . clearly constitutes serious harm"). Defendants have knowledge that Plaintiff faces a substantial risk of serious harm from both other prisoners and staff. Defendants know that Plaintiff has already been sexually abused at several men's prisons—they have actual knowledge of the risk of harm by nature of their participation in Plaintiff's other lawsuits, her grievances and PREA complaints, and Internal Affairs investigations. Defendants also know that Plaintiff is a transgender woman and is therefore particularly vulnerable in a men's facility. *See Hampton*, 2018 WL 5830730, at *2-3 (IDOC ordered to train all prison staff on transgender issues);*Perkins v. Martin*, No. 14-cv-00191-SMY-PMF, 2016 WL 3670564, at *3 (S.D. Ill. Jul. 11, 2016) (citing *Farmer* and listing "transgender prisoner with feminine characteristics in male prison" as a situation "where the prisoner plaintiff exhibits characteristics that make them more likely to be victimized"); *Doe v. D.C.*, 215 F. Supp. 3d 62, 77 (D.D.C. 2016)

(finding that a jury could infer that prison officials "knew Doe faced a substantial risk of rape because of her status as a transgender woman."); *Zollicoffer v. Livingston*, 169 F. Supp. 3d 687, 691 (S.D. Tex. 2016) (citing 2011 data from the Bureau of Justice Statistics, which "reported that 34.6% of transgender inmates reported being the victim of sexual assault," approximately nine times the rate of other prisoners, and stating that "[t]he vulnerability of transgender prisoners to sexual abuse is no secret."). Furthermore, the Facebook posts introduced into evidence in this case (Doc. 114-1, Exhibit 25; Doc. 112, p. 77-79) suggest that there is a deep-seeded culture of ignorance, harassment, and discrimination at IDOC.

During her incarceration, Plaintiff was raped by an officer at Menard and three times by other prisoners at Pontiac. (Doc. 111, p. 8-10). She also has been groped, verbally harassed, solicited, threatened by prisoners at every male prison she has been housed, and verbally harassed by officers. Even after substantiating some of her PREA complaints, IDOC refused to discipline officers and took no measures to protect Plaintiff from the prisoners who sexually assaulted her. *See Hampton*, 2018 WL 5830730, at *13 (finding transgender female plaintiff had a likelihood of success on the merits of her failure to protect claim where IDOC took no steps to protect her from future verbal and sexual harassment and abuse even after substantiated PREA complaints); *see also Farmer*, 511 U.S. at 845 ("one does not have to await the consummation of threatened injury to obtain preventive relief") (citation omitted); *Zollicoffer*, 169 F. Supp. 3d at 696 (finding that "Plaintiff has sufficiently alleged facts to show that Defendant knew of, and was deliberately indifferent to, the high risk of sexual assault of gay and transgender inmates

at the TDCJ facilities."); *Hoskins v. Dilday*, No. 16-CR-334-MJR-SCW, 2017 WL 951410, at *6 (S.D. Ill. Mar. 10, 2017) (finding a strong likelihood that the plaintiff will succeed on the merits of his Eighth Amendment claim where he alleged that he had been physically attacked by several defendants while other defendants did nothing to help him and that he had been threatened with future physical harm); *Mitchell v. Baker*, No. 13-cv-0860-MJR-SCW, 2015 WL 278852, at *5 (S.D. Ill. Jan. 21, 2015) (finding that the plaintiff has a substantial probability of success of the merits of his Eighth Amendment claim where he alleged that officers victimized him via frequent threats and physical abuse).

Defendants assert that the Court should not find Plaintiff in danger because in a letter dated July 9, 2019, to Warden Calloway, Plaintiff states in part that she does not know who is calling the prison or Springfield about her being in danger. (Doc. 104, p. 7). She goes on to say she has not told her family to call and that she does not have any immediate safety concerns. *Id.* The staff at Danville have immediately responded when they are provided any information regarding Plaintiff being unsafe, but Plaintiff has repeatedly informed staff that she is not experiencing any safety concerns. This single letter, however, is not sufficient to overcome the overwhelming evidence that Plaintiff is subject to ongoing harassment.

Defendants further suggest that because Plaintiff has not yet been raped or violently sexually assaulted in her current placement at Danville, her claim fails because she does not face a substantial risk of harm. But this is not the law. The Seventh Circuit has made clear that a substantial risk of harm "could exist where prison officials place a

detainee in a cell in which 'they know that there is a cobra there or at least that there is a high probability of a cobra there.'" *Budz*, 398 F.3d at 911(quoting *Billman v. Ind. Dep't of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995)). Given Plaintiff's history of sexual harassment, assaults, and rapes while incarcerated in the men's division of IDOC, keeping her there may be tantamount to confining her in a cell with a cobra. *See Becker v. Sherman*, No. 16-cv-0828 AWI MJS (PC), 2017 WL 6316836, at *5 (E.D. Cal. Dec. 11, 2017) (a transgender inmate had a reasonable fear of future harm, based on past assaults and her vulnerability in a male prison, even though she experienced periods in prison without assault); *Stover v. Corr. Corp. of Am.*, No. 12-cv-00393-EJL, 2015 WL 874288, at *9 (D. Idaho Feb. 27, 2015) (finding a triable issue of fact as to whether prison officials housing a transgender inmate in an open dorm with male prisoners constituted deliberate indifference to "such an obvious risk of sexual assault"); *Lojan v. Crumbsie*, No. 12 CV. 0320 (LAO), 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013) (holding that "mere knowledge" of an inmate's transgender status was sufficient to alert defendants of plaintiff's vulnerability and need for protection); *Solivan v. Dart*, 897 F. Supp. 2d 694, 704-05 (N.D. Ill. 2012) (finding that it was plausible that as a Hispanic plaintiff placed in a majority African-American ward, plaintiff was in an "identifiable group of prisoners who are singled out for attack"); *Duncan v. Quinn*, No. 15-cv-00087-MJR, 2015 WL 468768, at *5 (S.D. Ill. Feb. 3, 2015) (directing plaintiff to file a motion for preliminary injunction, because though plaintiff inmate had not suffered any assaults in the three weeks preceding this filing, his past assaults occurred with "increased frequency" and caused serious injury); *Samples v. Logan*

*Cty.*, *Ohio*, No. C2-03-847, 2006 WL 39265, at *7 (S.D. Ohio Jan. 6, 2006) (reasoning that a jury could find a warden's disregard for the plaintiff's vulnerability to sexual assault, based on his youth, to constitute deliberate indifference); *Espinoza v. Cty. of San Bernardino*, No. EDCV 07-812-VAP (JCRx), 2008 WL 11410021, at *10-11 (C.D. Cal. Dec. 19, 2008) (finding that plaintiff presented a triable issue of fact as to whether his physical and mental impairments and nature of his pending charges made him particularly vulnerable to assaults when placed in General Population housing).

### *Irreparable Harm and No Adequate Remedy at Law*

The moving party must demonstrate that she will likely suffer irreparable harm absent obtaining preliminary injunctive relief. *Whitaker*, 858 F.3d at 1044. The requirement of irreparable harm eliminates those cases where, although the ultimate relief sought is equitable, the plaintiff can wait until the end of trial to get that relief. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380 386 (7th Cir. 1984). Interim injunctive relief is only available if the plaintiff will suffer irreparable harm before final judgment is entered. *Id.* "This requires more than a mere possibility of harm." *Whitaker*, 858 F.3d at 1045. "It does not, however, require that the harm actually occur before injunctive relief is warranted." *Id.* "Nor does it require that the harm be certain to occur before a court may grant relief on the merits." *Id.* "Rather, harm is considered irreparable if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Id.*

"The moving party must also demonstrate that he has no adequate remedy at law should the preliminary injunction not issue." *Id. at* 1046. "This does not require that he

demonstrate that the remedy be wholly ineffectual." *Id.* "Rather, he must demonstrate that any award would be seriously deficient as compared to the harm suffered." *Id.*

The Court finds that Plaintiff will suffer irreparable harm before her claims can be tried and a final judgment entered. The harm she is likely to suffer is far from a mere possibility. Although the Court could have made that finding immediately following the evidentiary hearing, the allegations that staff at Danville continue to taunt and antagonize her, including about this lawsuit, convinces the undersigned even more that that is the case.

The ongoing deprivation of Plaintiff's Eighth and Fourteenth Amendment rights discussed above is an irreparable harm sufficient to warrant a preliminary injunction. *See Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.") (affirming grant of preliminary injunction in prison conditions case); *Planned Parenthood of Ind. and Ky., Inc. v. Comm'r*, 194 F. Supp. 3d. 818, 835 (S.D. Ind. 2016) (finding that the "presumption of irreparable harm also applies to equal protection violations"). And to be clear, the Court finds that the constitutional deprivations are ongoing, contrary to Defendants' suggestions that they are not.

The Court finds that Plaintiff's physical safety is at risk. During her time in IDOC custody, multiple prisoners have sexually assaulted, harassed, and threatened her. *See Hampton*, 2018 WL 5830730, at *15 (finding that transgender prisoner faced irreparable harm where she was continuously sexually assaulted in men's facilities and IDOC did

nothing to protect her); *Hoskins*, 2017 WL 951410, at *6 (finding that prisoner faced irreparable harm if he remained at Menard, where he "faces physical threats and is prevented from receiving needed medications and food trays at times"); *Baker*, 2015 WL 278852, at *5 (finding that irreparable harm was "undisputed" where plaintiff alleged that officers at Menard victimized him via frequent threats and physical abuse); *White v. Jindal*, No. 13-15073, 2014 WL 1608697, at *6 (E.D. Mich. Apr. 22, 2014) (finding that prisoner would suffer irreparable harm absent a preliminary injunction ordering his transfer to another facility where prisoner claimed that he was beaten by other prisoners and "warned that he would be beaten further if he did not provide 'protection money'"); *Pocklington v. O'Leary*, No. 86 C 2676, 1986 WL 5748, at *1 (N.D. Ill. May 6, 1986) (granting TRO and ordering warden not to return prisoner to general population status where plaintiff had been raped by other inmates, notified prison officers, and was ignored by them).

The Court finds that Plaintiff's mental health also is at risk. She has been forced to endure constant sexual abuse and harassment at various men's facilities, including Danville. *See Hampton*, 2018 WL 5830730, at *15 (finding that transgender prisoner faced irreparable harm where her mental health was at risk of "degrading further" due to daily verbal harassment and discrimination by prison staff); *Jones'El v. Berge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wis. 2001) (finding that plaintiffs would suffer irreparable harm absent a preliminary injunction where the conditions at Supermax posed a grave risk of harm to seriously mentally ill inmates). Plaintiff has already attempted suicide multiple times and

has frequently been on crisis watch, including in April 2019. There is a serious risk that Plaintiff will continue to have suicidal ideations or otherwise harm herself if she continues to be housed at a men's prison.

Defendants again couch their arguments against a finding of irreparable harm on the fact that IDOC does not base Plaintiff's placement decision on her assigned gender because it has transferred other transgender inmates to women's facilities. Defendants contend that Plaintiff's placement is the result of an individual decision. They point to the fact that she is not on hormone therapy and may potentially pose a danger to female inmates. The Court is not convinced that Plaintiff's placement was the result of an individualized decision and thus there is a likelihood of irreparable harm.

Finally, there is no adequate remedy at law—money will not make Plaintiff whole or protect her from physical and emotional abuse. *See Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) (stating that in prison conditions cases, "the quantification of injury is difficult and damages are therefore not an adequate remedy"); *Foster v. Ghosh*, 4 F. Supp. 3d 974, 983 (N.D. Ill. 2013) (granting preliminary injunction to prisoner requiring medical attention; no adequate remedy at law exists because "the consequence of inaction at this stage would be further deteriorated vision in both eyes"); *Pocklington*, 1986 WL 5748, at *1 (where prisoner faces a risk of rape,"[d]amages are plainly not an adequate remedy for the kind of further indignity with which [he] is threatened").

### Balance of Harms and Public Interest

"Once a moving party has met its burden of establishing the threshold

requirements for a preliminary injunction, the Court must balance the harms faced by both parties and the public as a whole." *Whitaker*, 858 F.3d at 1054. In so doing, the Court considers: (1) "the irreparable harm the movant party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted;" and (2) "the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the "public interest")." *Turnell*, 796 F.3d at 662. "The court weighs the balance of potential harms on a "sliding scale" against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Id.*

The balance of harms tips in Plaintiff's favor. The Court will only direct Defendants do their job:  protect Plaintiff from abusive staff and prisoners and house her appropriately based on an *individualized determination* of her needs. The Court has no intention of interfering with the operations IDOC. It is IDOC's responsibility to provide for the safety of all inmates within its custody, and the Court is not convinced in this case that it has lived up to that responsibility *with respect to Plaintiff*. The Court is not saying that IDOC cannot make decisions regarding where individual inmates are to be housed, just that those decisions need to be based on valid factors, which do not include an individual's size or incidents that didn't involve her or the fact that all inmates are subject to harassment from its staff and other inmates.

As in the *Hampton* case, the Court will not at this time order IDOC to transfer Plaintiff to Logan, because that may not cure the problem (although it could). But IDOC must come up with an individualized housing plan for Plaintiff in accordance with its affirmative duty to protect her from a substantial risk of harm. *Farmer*, 511 U.S. at 833-34 (prison officials are obligated to protect prisoners "from violence at the hands of other prisoners," including taking preventative measures when they are aware an inmate faced a substantial risk of serious harm). Here, Plaintiff has established that she has been, and continues to be, subjected to a substantial risk of serious harm. IDOC has a duty to create a plan to keep her safe.

Courts have routinely ordered IDOC to meet its burden to come up with an individualized plan to keep its inmates safe and address ongoing constitutional violations. The Court may also seek input and feedback from a plaintiff before it is entered by the Court. *See Williams v. Illinois Dep't of Corrections*, No. 13-cv-392-JPG-DGW, 2014 WL 1389043, at *1-2 (S.D. Ill. Apr. 9, 2014); *Lipscomb v. Pfister*, No. 12-cv-1041, 2014 WL 287269, at *3 (C.D. Ill. Jan. 27, 2014) (giving IDOC defendants 28 days to formulate a plan to keep segregated inmates, including those who had had feces thrown at them, safe at Pontiac Correctional Center); *see also Laube v. Haley*, 234 F. Supp. 2d 1227, 1253 (M.D. Ala. 2002) (ordering the state to submit a plan to address the overcrowding at a women's prison); *Knop v. Johnson*, 667 F. Supp. 467, 512 (W.D. Mich. 1987) (allowing the Michigan Department of Corrections 60 days to come up with remedial plans addressing lavatory access, access to the courts, and discrimination against black inmates); *Balla v. Idaho State*

*Bd. of Corr.*, 595 F. Supp. 1558, 1576 (D. Idaho) (requiring defendants to submit a plan within 180 days on adequately staffing the medical delivery system at the Idaho State Correctional Institution); *Parnell v. Waldrep*, 538 F. Supp. 1203, 1206 (W.D.N.C. 1982) (ordering defendants to submit a plan on offering inmates "constitutionally adequate opportunities for exercise" and a schedule for implementation); *Dawson v. Kendrick*, 527 F. Supp. 1252, 1318 (S.D. W.Va. 1981) (defendants ordered to submit a plan addressing a range of constitutional deficiencies, including sufficient plumbing, lighting, and bedding); *Kendrick v. Bland*, 541 F. Supp. 21, 33 (W.D. Ky. 1981) (ordering defendants to formulate plan for constitutional deficiencies, including reforming restricted confinement and visiting facilities).

In making an individualized assessment of Plaintiff and developing an individualized plan for her, IDOC also should consider her assertion that being housed in a men's prison is the primary cause of her suffering because, as a trans woman, she is especially vulnerable to physical and sexual violence from her male counterparts. IDOC should also consider whether the reason, as Plaintiff alleges, that she has not been able to receive treatment for her Gender Dysphoria is because she is in a male prison (*i.e.*, hormones would cause her to look and feel more feminine and thus more vulnerable to attack from men in a men's prison), and whether in a women's facility, she would not be subjected to the same risk of sexual and physical assault.

Similarly, IDOC should, if it is not already doing so, explore the possibility of creating a voluntary housing unit for transgender prisoners. A voluntary trans women's

housing unit that protects transgender women prisoners from abuse and integrates them into programming with ciswomen, instead of imposing segregation like conditions, might be an adequate solution for Plaintiff (and others like her). Dr. Puga has even acknowledged that this would be a very important step towards better protecting IDOC's transgender population. Notably, PREA regulations specify that vulnerable prisoners may not be "involuntarily" segregated from the general population. *See* PREA Prison and Jails Standards, 28 C.F.R. § 115.43. PREA further provides that "the Agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42. Based on the evidence in this case, including the unrefuted expert testimony, that case by case determination has not been made for Plaintiff here.

Further, the Court finds that it is in the public interest to ensure that Plaintiff's constitutional rights are not violated by correctional officers. *See Hoskins*, 2017 WL 951410, at *7 ("In this case the public interest is best served by ensuring that corrections officers obey the law."); *Jones 'EL*, 164 F. Supp. 2d at 1125 ("Respect for law, particularly by officials responsible for the administration of the State's correctional system, is in itself a matter of the highest public interest.").

Federal courts do not generally interfere with prison administrative matters in the absence of constitutional concerns. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Prison officials have discretion to transfer inmates to the facility that they deem most appropriate for a particular inmate. *Meachum v. Fano*, 427 U.S. 215, 228 (1976). An injunction should not

require specific remedies that are not constitutionally required, because the PLRA requires narrow-tailoring of injunctive relief. *Westerfer v. Neal*, 682 F.3d 679, 681 (7th Cir. 2012).

Here, Plaintiff is entitled to safety while incarcerated in IDOC. Perhaps Dr. Puga's new committee to review and make policy changes for transgender inmates and the possible creation of a transgender unit within IDOC will eliminate the discrimination and harassment to which Plaintiff has been subjected. But based on the evidence presented here, including the March 2020 status reports from counsel, the Court is not convinced that an individualized determination will be made for Plaintiff absent court intervention.

*Eleventh Amendment and PLRA*

Finally, the Court disagrees with Defendants that the Eleventh Amendment and the PLRA bar any relief in this case. As discussed above, the Court finds that there is an ongoing constitutional violation with respect to Plaintiff's incarceration. Her extensive history of enduring sexual violence and harassment is sufficient to establish a substantial risk of harm. She need not wait until she is raped again to seek relief from the Court.

While the Court is encouraged that IDOC is working on developing and implementing policies to address transgender issues, largely through the efforts of Dr. Puga, there appears to be no particular timeline for those policies, and, based on the evidence presented in this case, the Court needs assurances that Plaintiff's rights will be protected. Voluntary cessation of allegedly illegal conduct does not render a case moot, unless "there is no reasonable expectation that the wrong will be repeated," but this is a

heavy burden to prove. *United States v. W. T. Grant Co.,* 345 U.S. 629, 633 (1953). Defendants' "plans" do not meet this heavy burden. Even if a meeting that took place amidst litigation and between the preliminary injunction hearings was found to be cessation of allegedly illegal conduct, injunctions are forward looking and therefore, "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *Id.* ("The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.").

## DISPOSITION

For the reasons set forth above, the Court **GRANTS in part** Plaintiff's request for preliminary injunctive relief (Doc. 2). The Court **ORDERS** Defendants, within **21 days** of this Order, to develop an individualized case management plan for Plaintiff that takes into consideration Plaintiff's need for safety, her past history of victimization, her medical and psychiatric history, all PREA standards, and the expert witness opinions set forth in this Order and to **file that plan with the Court** no later than **May 22, 2020**. The Court will then seek input from Plaintiff as to Defendants' proposal.

In addition, when they report to the Court the details of their individualized plan, Defendants shall report what, if any, efforts they have made to explore the possibility of creating a voluntary housing unit for transgender prisoners in IDOC; what, if any, steps have been taken to create a Transgender Policy Committee to address the needs of transgender inmates. The Court also directs Defendants to advise the Court what, if any, training has been conducted for staff since November 2018, and what, if any, employee

discipline was imposed as a result of the Facebook posts introduced at Ex. 25.

Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the preliminary injunctive relief set forth above in a separate document.

**IT IS SO ORDERED.**

**DATED:  May 1, 2020**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**