## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

TAY TAY                                          )
                                                 )
           Plaintiff,                            )
                                                 )
           v.                                    )          Case No. 19-cv-00501
                                                 )
ROB JEFFREYS, WARDEN JEFF                         )          Judge Nancy J. Rosenstengel
DENNISON, ASSISTANT WARDEN                       )
WALKER, KRISTIN HAMMERSLEY,                      )
SERGEANT HICKS, LIEUTENANT                       )
PICKFORD, OFFICER GARRET, OFFICER                )
SORIA, LIEUTENANT CAMPBELL,                      )
INTERNAL AFFAIRS OFFICER STUCK,                  )
OFFICER RONALD HUTCHISON,                        )          JURY TRIAL DEMANDED
WARDEN KIMBERLY LARSON,                          )
DR. WILLIAM PUGA, and DR. SHANE                  )
REISTER,                                         )
                                                 )
           Defendants.                           )

## SECOND AMENDED COMPLAINT

Plaintiff Tay Tay, by her undersigned attorneys, for her complaint against Illinois

Department of Corrections Director Rob Jeffreys, Warden Jeff Dennison, Assistant Warden

Walker, Kristin Hammersley, Sergeant Hicks, Lieutenant Pickford, Officer Garrett, Officer

Soria, Lieutenant Campbell, Internal Affairs Officer Stuck, Officer Ronald Hutchison, Warden

Kimberly Larson, Dr. William Puga, and Dr. Shane Reister, alleges as follows:

## INTRODUCTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation

under color of law of Plaintiff's rights as secured by the Eighth and Fourteenth Amendments to

the United States Constitution.

1

2.      Plaintiff is a transgender woman who was previously incarcerated in the Illinois Department of Corrections ("IDOC").  During her time in the IDOC, Plaintiff was repeatedly sexually assaulted by other prisoners.  She was also subjected to constant sexual harassment at the hands of both prisoners and IDOC staff.  As a result of the abuse she endured, Plaintiff experienced several mental health crises, including several suicide attempts and self-mutilation episodes.

3.      Throughout her incarceration, Plaintiff repeatedly requested that IDOC staff keep her safe, including by transferring her to a women's prison.  IDOC officials denied Plaintiff's requests, in line with IDOC's policy and practice of housing prisoners according to their sex assigned at birth.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

6.      Plaintiff was at all relevant times an Illinois Department of Corrections prisoner.

7.      Defendant Rob Jeffreys is the Director of the Illinois Department of Corrections ("IDOC").  As such, he was acting under color of law.  At all relevant times to the events at issue in this case, the Director maintained administrative and supervisory authority over the operations of all prisons in Illinois.  At all relevant times, the Director promulgated rules, regulations, policies, and procedures of the IDOC.  Defendant Jeffreys is sued in his individual capacity.

8.      Defendant Jeff Dennison is the Warden of Shawnee Correctional Center.  At all times relevant to the events at issue in this case, Defendant Dennison was employed by the

2

Illinois Department of Corrections.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Dennison promulgated rules, regulations, policies, and procedures at Shawnee.  Defendant Dennison is responsible for supervising all staff and managing all operations at Shawnee.  He is sued in his individual capacity.

9.      Defendant Walker is the Assistant Warden of Shawnee Correctional Center.  At all times relevant to the events at issue in this case, Defendant Walker was employed by the Illinois Department of Corrections.  As such, she was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Walker promulgated rules, regulations, policies, and procedures at Shawnee.  Defendant Walker is responsible for supervising staff and managing all operations at Shawnee.  She is sued in her individual capacity.

10.      Defendant Sergeant Hicks, Lieutenant Pickford, Officer Garrett, and Officer Ronald Hutchison are officers at Shawnee Correctional Center.  At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the Illinois Department of Corrections.  These defendants are sued in their individual capacities.

11.      Defendant Kristin Hammersley is a Licensed Clinical Social Worker at Shawnee Correctional Center.  At all times relevant to the events at issue in this case, Defendant Hammersley was acting under color of law and within the scope of her employment with the Illinois Department of Corrections.  Defendant Hammersley is sued in her individual capacity.

12.      Defendant Officer Soria is an officer at Dixon Correctional Center.  At all times relevant to the events at issue in this case, Defendant Soria was acting under color of law and within the scope of his employment with the Illinois Department of Corrections.  Defendant Soria is sued in his individual capacity.

13.     Defendant Warden Kimberly Larson is the Warden of Danville Correctional Center.  At all times relevant to the events at issue in this case, Defendant Larson was employed by the Illinois Department of Corrections.  As such, she was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Larson promulgated rules, regulations, policies, and procedures at Danville.  Defendant Larson is responsible for supervising all staff and managing all operations at Danville.  Defendant Warden Larson is sued in her individual capacity.

14.     Defendants Lieutenant Campbell and Internal Affairs Officer Stuck are officers at Danville Correctional Center.  At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the Illinois Department of Corrections.  These defendants are sued in their individual capacities.

15.     Defendant Dr. William Puga is the Chief of Psychiatry for the Illinois Department of Corrections.  He is also the chairman of the Transgender Care Review Committee.  At all times relevant to the events at issue in this case, Defendant Dr. Puga was acting under color of law and within the scope of his employment with the Illinois Department of Corrections.  Defendant Dr. Puga is sued in his individual capacity.

16.     Defendant Dr. Shane Reister is the Southern Regional Mental Health Director for the Illinois Department of Corrections.  He is also a member of the Transgender Care Review Committee.  At all times relevant to the events at issue in this case, Defendant Dr. Reister was acting under color of law and within the scope of his employment with the Illinois Department of Corrections.  Defendant Dr. Reister is sued in his individual capacity.

## FACTUAL ALLEGATIONS

17.     Plaintiff is a transgender woman.  Plaintiff knew she was a female from a very young age.  Around 27 years ago, she began identifying as female in places where she felt comfortable.  Despite the harassment she received in IDOC as detailed below, Plaintiff decided to openly identify as female around ten years ago while in IDOC custody.

**Plaintiff's Experience as a Transgender Woman in IDOC Men's Prisons**

18.     Plaintiff entered IDOC custody in 2002, and was released on July 20, 2020. During her entire time in IDOC custody, Plaintiff was exclusively housed in men's prisons.

19.     In 2003, Plaintiff told a nurse at Stateville that she identifies as a woman. However, she was ignored and did not receive any treatment or further evaluation.

20.     In or around 2008 or 2009, Plaintiff told a mental health professional that she identifies as a woman.  She again did not receive any treatment or further evaluation.

21.     In or around 2010, eight years after entering IDOC custody, a mental health professional finally listened to Plaintiff and recognized that she is a transgender woman.

22.     Since then, Plaintiff has been repeatedly diagnosed with gender dysphoria, including in 2010 by Dr. Panabella at Illinois Rivers Correctional Center, in 2012 by Dr. Adkisson at Western Correctional Center, and in 2013 by Dr. Rodos at Western.

23.     In or around 2013, three years after IDOC first recognized Plaintiff as a transgender woman, IDOC finally began providing Plaintiff with hormone therapy.  She was on hormone therapy from around 2013 until 2015.

24.     Plaintiff began having concerns about the hormones and raised these concerns with Dr. Santos.  Plaintiff has a family history of diabetes and was concerned about whether the hormones could have any effect on her risk of developing diabetes.

25.      Plaintiff also discussed her concerns about harassment with Dr. Santos.  Plaintiff told Dr. Santos that other prisoners were harassing her because she was forced to take her hormones in view of other people.

26.      Rather than address these concerns with Plaintiff, Dr. Santos decided to discontinue her hormone treatment altogether.

27.      Plaintiff wanted to continue hormone therapy at IDOC.  However, she was concerned about her health and safety while on hormones due to improper monitoring by medical staff and the harassment from other prisoners.  The hormones caused Plaintiff's features to feminize and decreased her strength, making her a target for sexual assaults by other prisoners. Plaintiff was primarily concerned about her safety and wanted to be able to transition in an environment where she felt safe and protected.

28.      Plaintiff was also been diagnosed with Post-Traumatic Stress Disorder ("PTSD"), anxiety, and depression by numerous other mental health professionals while in IDOC.

29.      Plaintiff suffered from crying spells, hearing voices, self-mutilation, suicidal thoughts, and attempted suicide while in IDOC.

30.      Plaintiff experienced intensified crying spells, hearing of voices, mood swings, hypervigilence, panic attacks, nightmares, suicidal thoughts, anxiety, depression and PTSD when single-celled or when placed on suicide watch.

31.      Plaintiff attempted suicide in IDOC custody numerous times, including on January 23, 2013, April 18, 2013, on or about February 17, 2017, and in December 2017.  After her December 2017 suicide attempt, Plaintiff was put on suicide watch at least six times, including once in April 2019.

32.     Plaintiff was continuously sexually harassed by corrections officers and other prisoners because of her gender identity.

33.     Prisoners were constantly exposing themselves to Plaintiff, extorting her, groping her, and touching her inappropriately.  Plaintiff first reported this type of behavior in 2010.  She was getting harassed and assaulted so frequently that she eventually stopped reporting these actions out of fear that she would be blamed or retaliated against for reporting.

34.     Plaintiff suffered numerous sexual assaults because of her gender identity while in IDOC custody.  One sexual assault she experienced in 2010 was the subject of another lawsuit.

35.     In June 2018 in Shawnee, Plaintiff was housed in a cell in the health care unit with six other prisoners who were all harassing her because she is transgender.  She did not have any privacy in this cell.  The other prisoners were also stealing her property.

36.     Plaintiff told Defendants Warden Dennison and Assistant Warden Walker that she did not feel safe in that cell and needed to be moved.  Defendant Warden Dennison refused to address Plaintiff's concerns.  Defendant Warden Walker refused to move Plaintiff until she picked a new cellmate.  Plaintiff explained that she did not know anyone at the prison who would want to be cellmates with her.

37.     Plaintiff also told Defendant Hammersley that she did not feel safe in this housing assignment.

38.     Out of desperation to get out of the cell with the six prisoners, Plaintiff gave correctional officers the name of another prisoner who she could be housed with.  She did not know much about this prisoner, but was desperate to get out of her current cell and feel safe.

39.     Upon information and belief, Defendants Lieutenant Pickford, Officer Garrett, Hammersley, and Assistant Warden Walker all played a role in allowing Plaintiff to be housed with this prisoner.

40.     Plaintiff and this prisoner were housed in a cell together in receiving on or around June 27, 2018.

41.     Defendant Sergeant Hicks refused to let Plaintiff and her cellmate out of their cell despite the fact that they were not on lockdown status.  Defendant Sergeant Hicks called Plaintiff derogatory and degrading names.  In response to Plaintiff asking to be let out of her cell, Defendant Sergeant Hicks told her to "shut up, fag" and "go suck a dick."

42.     Because they were not let out of their cell, Plaintiff's cellmate became aggressive and started blaming and threatening her.

43.     Plaintiff told Defendants Sergeant Hicks and Hammersley that she did not feel safe because her cellmate was being aggressive and threatening her.  These Defendants refused to do anything to help Plaintiff.

44.     The first night Plaintiff was housed with her cellmate, she told a correctional officer that she wanted a crisis team, but the officer ignored her request to see a crisis team.

45.     The following day, when she was let out of her cell to go to medical, she gave a note to Defendant Hammersley explaining that she did not feel safe being housed with her cellmate.  Plaintiff gave Ms. Hammersley the name of another prisoner so that she could be rehoused immediately.  However, Plaintiff was not rehoused.

46.     When she was back in her cell later that day, she again told Sergeant Hicks that she did not feel safe and requested to file a grievance.  He again called her derogatory names and refused to allow her to file a grievance or to let her out of the cell.

8

47.     Later that night, into the early hours of June 29, 2018, on the third shift around 1:00 or 2:00 am, Plaintiff's cellmate raped her.

48.     Plaintiff's cellmate put a shirt on the door to conceal the rape.  While the rape was occurring, Defendant Officer Ronald Hutchison conducted a cell check.  Defendant Officer Hutchison opened the cell door to tell them to remove the shirt.  When he opened the cell door, Plaintiff's cellmate jumped on the toilet to pretend like nothing was happening.  But Defendant Officer Hutchison saw Plaintiff sitting on the floor naked and scared.  Defendant Officer Hutchison did nothing to protect Plaintiff; rather, he just told them to remove the shirt and continued walking.

49.     After the rape in the morning on June 29, 2018, Plaintiff was removed from her cell and placed on suicide watch.

50.     Plaintiff called PREA to report this incident and filed a grievance.  Upon information and belief, the investigation only consisted of interviewing Plaintiff and the cellmate.  Plaintiff's PREA complaint was eventually found to be unsubstantiated.

51.     After being removed from suicide watch, Plaintiff was placed alone in the same exact cell where she was raped, forcing her to relive the trauma all over again.

52.     Plaintiff should never have been housed with the prisoner who raped her.  That prisoner had already been identified by IDOC to be a "predator" who was not allowed to be housed with vulnerable prisoners like Plaintiff.  Upon information and belief, the prisoner had been investigated for sexual misconduct just months before Defendants Walker, Dennison, Hammersley, Pickford, and Garrett approved his housing placement with Plaintiff.

53.     Plaintiff was transferred to Dixon Correctional Center on August 1, 2018.

54.     While at Dixon, Plaintiff was harassed by Defendant Officer Soria because she is transgender.  Defendant Soria made many derogatory comments towards Plaintiff, including telling her to stop talking like a girl and calling her "gay," "fag," and a "sissy."  Defendant Soria also sometimes refused to give Plaintiff her food tray.  Plaintiff filed a PREA complaint against Defendant Soria.  Based on information and belief, nothing was done to investigate these allegations.

55.     Plaintiff also talked to Internal Affairs at Dixon about filing PREA complaints because she was being harassed and groped by other prisoners.  In January 2019, the Internal Affairs Officers told Plaintiff that if she filed a PREA complaint, she would not be transferred to Graham Correctional Center and would instead be punished and placed in segregation.  The IA Officers told Plaintiff that they would investigate these allegations on their own without a formal complaint.  Upon information and belief, the IA Officers did not investigate these allegations of harassment.

56.     On February 27, 2019, Plaintiff was transferred to Graham Correctional Center.

57.     While at Graham, Plaintiff was bullied and harassed by other prisoners, particularly when she tried to use the phone.  She was called many transphobic names.

58.     Soon after arriving at Graham, another prisoner sexually harassed and threatened Plaintiff.  He tried to force Plaintiff to have sex with him.  He was aggressive towards Plaintiff and tried to force her to come out of her cell.

59.     Plaintiff told Internal Affairs about this individual and filed a grievance.  Upon information and belief, Internal Affairs did not conduct a formal investigation.  The Officers at Graham did nothing to protect plaintiff from this prisoner or the others that were harassing her.

60.     On March 22, 2019, Plaintiff was transferred to Danville Correctional Center. Plaintiff remained at Danville for over a year until she was released from IDOC custody on July 20, 2020.[1]

61.     Soon after arriving at Danville, another prisoner told Plaintiff that he wanted to have sex with her and pushed her toward the bathroom in an attempted sexual assault.  Plaintiff was able to get away from this prisoner.

62.     This prisoner then lived in the same housing unit as Plaintiff for a period of time, despite the fact that she pointed him out, showed his picture to staff, and requested that staff keep him separate from her for months.  And even when they were not living in the same housing unit, Plaintiff saw this prisoner when she visited the healthcare unit.

63.     When Plaintiff was housed in receiving at Danville, another prisoner started to harass her, threaten her, and told her that he wanted to have sex with her.  Plaintiff complained to officers about this prisoner and told them she did not feel safe around him.  Despite Plaintiff's complaints, this prisoner was later moved onto the same housing unit as Plaintiff.  Plaintiff again told officers that the prisoner continued to harass and threaten her.  Despite knowing that he was threatening her, officers continued to allow this man to be housed on the same unit near Plaintiff for a couple of days.

64.     Other prisoners at Danville stole her property, harassed her, and made comments about what they wanted to do to her—they told her they wanted to have sex with her, have sex with her in the shower, and have her "suck [their] dicks."

---

[1] IDOC transferred Plaintiff without her consent to an inpatient psychiatric facility, Elgin Treatment Center, on July 25, 2019.  This abrupt and wholly inappropriate transfer necessitated the filing of a motion for a temporary restraining order to get Plaintiff transferred out of Elgin.  Then two days before the scheduled August 2, 2019 hearing on Plaintiff's motion for a temporary restraining order, IDOC decided to transfer Plaintiff back to Danville—as it was abundantly clear that Plaintiff never should have been sent to Elgin in the first place.

65.     Officers additionally attempted to house Plaintiff with another prisoner who made derogatory statements about Plaintiff and who is transphobic.  Fearing for her safety and completely desperate, Plaintiff asked for a crisis team and was placed on suicide watch.  Staff told her they did not care if people were making derogatory comments and that they can house her with anybody they want.

66.     In October 2019, officers moved a new cellmate into Plaintiff's cell.  Upon his moving in, this prisoner told Plaintiff that he "doesn't like transgender people and who the hell would like to be celled with a transgender inmate."  This new cellmate also told her that she must do her "gay shit" when he is out of the cell.  Plaintiff immediately attempted to tell the sergeant working that shift that her new cellmate was transphobic and getting aggressive, and that she did not feel safe, but the sergeant reportedly did not know what to do.  Ultimately, she spoke to another inmate in the building block who helped her find other channels to get the aggressive, transphobic cellmate removed from her cell.  After this incident, Plaintiff remained scared because even in the midst of litigation, the Defendants kept putting her in harm's way.

67.     Plaintiff filed multiple grievances and PREA complaints about the verbal and sexual harassment she endured at Danville prior to initiating this lawsuit, and she continued to do so as the case progressed.  However, her grievances and complaints were either ignored or not properly investigated, and many individuals who she complained about continued to be allowed around her.

68.     Defendants Lieutenant Campbell and Internal Affairs Stuck often attempted to discourage Plaintiff from filing grievances, telling her that she was causing a disturbance because she was complaining too much.  These Defendants refused to do anything to protect her from the prisoners that were harassing her.

69.     Plaintiff's problems with Lieutenant Campbell continued through her time at Danville.  She filed numerous emergency grievances and numerous mental health requests about keeping him away from her for antagonizing her, harassing her, making inappropriate comments, and threatening her with tickets.  She reported extreme anxiety, panic attacks, and feeling suicidal after talking to him.  Regardless, she was still left alone with him and he continued to be responsible for "investigating" her PREA complaints.

70.     When Plaintiff was moved to a new housing unit in late January 2020, she continued to face verbal and sexual harassment from other prisoners.  There were multiple individuals in her new unit that were supposed to be kept separate from her due to substantiated PREA complaints she had previously filed against them.  One of these individuals once stole property from Plaintiff, while another had used homophobic slurs against her repeatedly. Plaintiff made staff aware of these individuals, and yet nothing was done to redress the situation.

71.     In or around early March 2020, while Plaintiff was on her way to the health care unit, she saw the prisoner who had raped her at Pontiac in 2010.  This prisoner was on his way to the yard and he called out Plaintiff's name to get her attention.  This was the first time she learned that he was at Danville and it was a traumatic moment for her to see her rapist.  She continued to remain worried that she would see her rapist again during the remainder of her time at Danville.

72.     Plaintiff submitted a list of other prisoners whom she felt safe around, including other transgender individuals, and requested that she be housed in the same cell with one of them.  Defendant Lieutenant Campbell denied her request and stated that she was not allowed to be housed with another transgender individual, regardless of how it could improve her safety.

73.     After the preliminary injunction hearing, whenever Plaintiff attempted to bring up safety concerns to Defendants Lieutenant Campbell and Lieutenant Stuck, they responded by taunting and antagonizing her about this case.  Lieutenant Campbell and Lieutenant Stuck made statements to Plaintiff such as "why are you relying on me, aren't you suing me?" "you still suing us?" and "I guess you do not think I am so bad if you want my protection."  And prior to the Court's ruling granting Plaintiff preliminary injunctive relief in May 2020, Defendant Lieutenant Campbell taunted Plaintiff by stating: "why hasn't the judge ruled yet, maybe they like you with us."

74.     When Plaintiff tried to tell Defendant Lieutenant Campbell about her safety concerns, he refused to do anything and made condescending comments like "you'll be alright" or "transgenders are not in danger in IDOC."  When Plaintiff complained about the people harassing her to other officers at Danville, they ignored her complaints and told her that she was being "annoying."  The officers' comments signaled to other prisoners that they would not get in trouble if they harassed Plaintiff.

75.     Throughout her time at Danville, Plaintiff wrote numerous letters to Defendant Warden Larson asking for help, but she did received a single response.  In these letters, Plaintiff described her experiences with discrimination, harassment, the move to a dangerous housing unit, being moved to various cells, not being separated from people harassing her, and the inability to participate in any programs that would help her earn goodtime.  Her repeated requests to speak to Warden Larson were ignored.  Despite being aware of Plaintiff's safety issues, Defendant Warden Larson refused to do anything to address Plaintiff's safety concerns.

76.     Constantly fearing for her safety, Plaintiff avoided going to the lunchroom for her meals for months.  She was terrified that if she went to the lunchroom to eat meals, she would be

attacked by the prisoners who had been threatening her.  She also avoided going to the gym or

yard because she was worried that she would run into her rapist and other inmates who harassed

her.

77.     During her last few months in IDOC custody, other prisoners in her housing unit

began to escalate their harassment of Plaintiff, knowing that officers were not paying attention to

Plaintiff's complaints due to the COVID-19 pandemic.  Officers used the COVID-19 pandemic

as an excuse to ignore Plaintiff's safety concerns.

78.     While in IDOC custody, including at Shawnee, Graham, Dixon, and Danville,

Plaintiff was also subjected to pervasive verbal sexual harassment by correctional officers,

including Defendants Soria and Hicks, and medical and mental health staff.  IDOC staff

consistently called her derogatory names.  Defendants Warden Dennison and Warden Larson

were aware of the pervasive verbal sexual harassment Plaintiff endured from staff while in their

custody and failed to do anything to stop the verbal sexual harassment.

79.     Correctional officers as well as medical and mental health staff, including the

Defendants, also exclusively referred to Plaintiff with male pronouns.  This consistent

misgendering is a form of harassment against transgender women.  Defendants Warden

Dennison and Warden Larson were aware of this specific type of harassment and took no action

to address the misgendering of Plaintiff while she was in their custody.

80.     As a result of constantly having to endure verbal sexual harassment, attacks, and

threats to her safety, Plaintiff lived with consuming anxiety and fear while in IDOC custody.

**IDOC's Official Policy is to House Transgender Women Based Solely on Gender Assigned
At Birth**

81.     The medical diagnosis of gender dysphoria refers to the condition characterized

by clinically significant "distress that may accompany the incongruence between one's

15

experienced or expressed gender and one's assigned gender."  Gender dysphoria is not a mild discomfort with one's assigned sex.  Rather, it is a profound disturbance that, if left untreated or inadequately treated, can lead to severe mental anguish and the inability to function normally at school, at work, or in a relationship.  The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (the "DSM-5") classifies gender dysphoria as a serious medical condition.

82.     The DSM-5 lists six criteria which, when present in some combination, trigger a diagnosis of gender dysphoria.  These are (i) a marked incongruence between one's gender identity and one's sex characteristics; (ii) a strong desire to be rid of one's sex characteristics because of that incongruence; (iii) a strong desire for the sex characteristics of the other gender; (iv) a strong desire to be of another gender; (v) a strong desire to be treated as another gender; and (vi) a strong conviction that one's feelings and reactions are typical of another gender.  An individual must experience two or more of these criteria for at least six months to be diagnosed with gender dysphoria.

83.     IDOC completely disregards gender dysphoria diagnoses when making housing and placement decisions.  IDOC's official policy is to house prisoners solely on the basis of their sex assigned at birth.[2]

84.     Plaintiff filed her first grievance requesting transfer to a women's prison in or around 2012.  Her grievance was denied.  Since then, she filed multiple grievances requesting

---

[2] Although there has been two recent instances of transgender woman prisoners being transferred to the women's division in IDOC, that occurred only after extensive litigation and entry of a preliminary injunction against IDOC.  *See Hampton v. Baldwin, et al*, No. 3:18-cv-550-NJR-RJD (S.D. Ill. Nov. 7, 2018).  In Ms. Hampton's case, the Court directed IDOC to undertake the kind of individualized housing evaluation called for under the PREA regulations.  Once IDOC undertook this evaluation, it made the obviously appropriate decision to transfer Ms. Hampton to a women's facility.  *See* Angie Leventis Lourgous, *I'm Safe Here: Transgender Woman Describes Life at Illinois Woman's Prison*, CHICAGO TRIBUNE, Jan 29, 2019.  After Ms. Hampton was transferred, IDOC agreed to transfer another prisoner, Ms. Monroe, after doing an individualized housing evaluation at the request of counsel in order to avoid another lawsuit.

transfer to a women's prison, all of which were denied.  She exhausted many of those grievances, all the way to the Director.

85.     IDOC officials acted pursuant to this official policy in response to Plaintiff's request for a transfer to a women's prison.

86.     IDOC follows this policy not for any legitimate penological purpose, but rather for the purpose of avoiding potentially unfavorable publicity.

87.     The application of this policy to Plaintiff violated her right to be free from cruel and unusual punishment as well has her right to equal protection.

88.     The Transgender Care Review Committee ("TCRC") is responsible for making placement recommendations for transgender prisoners in IDOC.  It is the responsibility of the TCRC to evaluate a transgender prisoner's request to be transferred to the women's division, and then make a recommendation on the transgender prisoner's request to the Director.  Director Jeffreys then has the sole authority to decide whether or not to follow the TCRC's recommendation.  Director Jeffreys has the final word on whether a transgender woman prisoner can be transferred to the women's division.  Defendants Dr. Puga and Dr. Reister are both standing members of the TCRC.  Defendant Dr. Puga has been the chairman of the TCRC since August 2018.

89.     Prior to July 16, 2019, whenever the TCRC met to review Plaintiff, the committee never addressed Plaintiff's request to be transferred to the women's division or her safety concerns.

90.     On July 16, 2019, after the initiation of this lawsuit, the TCRC finally reviewed Plaintiff's transfer request and unanimously voted against transferring Plaintiff to Logan

Correctional Center, a women's prison.  Additionally, the TCRC did not discuss any alternatives to keep Plaintiff safe.

91.     In deciding not to transfer Plaintiff to Logan, the TCRC considered Plaintiff's height and musculature, her functioning male organs, and the experiences of two other transgender women recently transferred to Logan.  However, none of these factors were legitimate justifications to deny Plaintiff's transfer to Logan.  Further, the TCRC failed to undergo the individual analysis required under the PREA regulations and take into consideration Plaintiff's safety concerns, PREA complaints, grievances, crisis watch placements, or suicide attempts.

92.     Dr. Puga and Reister both met with Plaintiff prior to the July 16, 2019 meeting and were both well aware of Plaintiff's history of sexual abuse and harassment in men's prisons and her ongoing safety concerns—they reviewed her records, including her medical and mental health records, her grievances, and her PREA complaints, and personally interviewed her. Defendants Dr. Puga and Dr. Reister were also aware of Plaintiff's criminal history and institutional record, including her disciplinary record, and knew, or should have known, that Plaintiff was not a safety risk to other women prisoners and that there was no legitimate penological justification to keep her in the men's division.  Despite being aware of this information, Dr. Puga and Dr. Resiter refused to recommend that Plaintiff be transferred to the women's division.  They also refused to make any recommendations to address Plaintiff's safety concerns in the men's division.

93.     Defendant Jeffreys was aware of the sexual abuse and harassment Plaintiff endured in men's prisons and her request to be transferred to the women's division, especially in light of the instant lawsuit.  However, Defendant Jeffreys refused to transfer Plaintiff to the

women's division despite being the ultimate decision maker on her placement.  Defendant

Jeffreys also refused to take action to change any policy or procedure or direct his employees to

take any action to ensure that Plaintiff was protected from sexual abuse and harassment while

she was housed in the men's division.

**IDOC Knew That Its Policy Exposed Plaintiff to a Substantial Risk of Harm**

94.     As the National PREA Resource Center puts[3] it: "Being transgender is a known

risk factor for being sexually victimized in confinement settings."  *See* National PREA Resource

Center, at https://www.prearesourcecenter.org/node/3927; *see also id.* ("Q: Does a policy that

houses transgender or intersex inmates based exclusively on external genitalia violate Standard

115.42(c) & (e)? A: Yes." (March 24, 2016)).

95.     Additionally, the U.S. Department of Justice's Bureau of Justice Statistics

reported in 2014 that almost 40% of transgender prisoners reported sexual victimization in state

and federal prisons—a rate that is ten times higher than for prisoners in general. U.S. Dep't of

Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by*

*Inmates, 2011-12*, *Supplemental Tables: Prevalence of Sexual Victimization Among Transgender*

*Adult Inmates*, Dec. 2014, at https//www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

96.     The Prison Rape Elimination Act of 2003 (PREA) is a federal law that prohibits

and seeks to eliminate sexual abuse and sexual harassment in prisons.

97.     Because Illinois prisons receive federal funds, IDOC is required under PREA to

comply with regulations set forth at 28 CFR § 115.14 et seq.

---

[3] The National PREA Resource Center (PRC) is a project of the U.S. Department of Justice Bureau of
Justice Assistance. The PRC's aim is to provide assistance to those responsible for state and local adult
prisons and jails, juvenile facilities, community corrections, lockups, tribal organizations, and inmates and
their families in their efforts to eliminate sexual abuse in confinement.  *See* National PREA Resource
Center, at https://www.prearesourcecenter.org/about.

98.     As a result of PREA and widely published studies like the ones cited above, prison administrators like Defendant Jeffreys know that prisoners like Plaintiff face a serious risk of harm in men's prisons.

99.     Under the PREA regulations, IDOC officials are required to make an individualized determination of appropriate housing when it comes to housing assignments for transgender prisoners.  The regulation states: In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety and whether the placement would present management or security problems.  28 C.F.R. § 115.42(c).

100.    PREA regulations also require IDOC officials to give serious consideration to a prisoner's own subjective views of his or her own safety.  *See* Section 115.42(d) ("A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.").

101.    Given PREA requirements and the fact that the corrections field has generated numerous, widely circulated studies regarding the high risk of sexual abuse faced by transwomen in U.S. Prisons and jails, prison administrators like Defendant Jeffreys know these regulations exist to protect the health and safety of transgender prisoners.

102.    Prison administrators know that transgender prisoners like Plaintiff are at risk of harm in men's prisons and that it is necessary to follow the PREA regulations in order to ensure the health and safety of transgender prisoners.

103.    IDOC purports to comply with PREA regulations, but it has clearly not done so with respect to Plaintiff.

104.    IDOC's policy not only runs counter to PREA regulations, but it is also counter to generally professional accepted standards in the medical and mental health fields.

105.    The American Medical Association (AMA) has made a policy statement supporting prison housing policies that allow transgender prisoners to be placed in correctional facilities that are reflective of their affirmed gender status.

106.    As AMA Immediate Past Chair Patrice A. Harris, M.D. put it, "The problem facing the safety and health of transgender prisoners is severe and well-documented. . . . Transgender prisoners are disproportionately the victims of sexual assault, suffering higher rates of sexual assault than general population inmates." *See* American Medical Association, *AMA Urges Appropriate Placement of Transgender Prisoners* (June 11, 2018), at https://www.ama-assn.org/press-center/press-releases/ama-urges-appropriate-placement-transgender-prisoners.

107.    Further, the controlling standards of care for trans people in corrections indicate that: "Housing and shower/bathroom facilities for transsexual, transgender, and gender nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety.  Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the external genitalia may not be appropriate and may place the individual at risk for victimization.  Institutions where transsexual, transgender, and gender nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents."

108.    IDOC officials recognize that prisoners who are women have different needs than prisoners who are men.  In particular, women are more likely than men to have experienced sexual abuse or other forms of victimization in the past.  Likewise, women typically come to prison with significant trauma histories.

109.     In 2018, Illinois enacted a law that formally creates a "Women's Division" within the Illinois Department of Corrections (IDOC).  *See* 730 ILCS 5/3-2-5.5.

110.     The law requires IDOC to develop and implement "gender responsive and trauma informed" practices at prisons within the Women's Division.  IDOC officials have been implementing these practices at Illinois women's prisons through innovative training programs.

111.     For example, staff at IDOC women's prisons are trained to:

   a)  "Keep in mind that gender does make a difference."

   b)  "Create an environment based on safety, respect, and dignity."

   c)  "Support practices and programs that promote healthy connections to children, family, and the community."

   d)  "Refer issues of substance abuse, trauma and mental health issues to relevant services and appropriate supervision."

   e)  "Encourage female offenders to improve themselves through educational and vocational programs."  *See* Illinois Department of Corrections, *Supervising the Female Offender* (undated).

112.     Staff is also specifically trained to address female prisoners respectfully at all times, and to use respectful titles, such as "Ms" when addressing individual prisoners.

113.     Staff also receives specialized training on how to best interact with people like Plaintiff who have trauma histories (also called "trauma informed practices").

114.     IDOC requires "trauma informed practices" in women's prisons because evidence shows that those practices lead to better outcomes for women prisoners.  It leads to less conflict among prisoners and reduces the need for punishment.

22

115.    As the previous Warden of Logan Correctional Center described to the *Chicago Tribune*, "[T]he culture at Logan has undergone an immense culture shift recently, with staff undergoing innovative training on strategies for working with female inmates, recognizing trauma, de-escalating conflict and working with those who are mentally ill."

116.    The previous Warden of Logan Correctional Center acknowledged that transgender women can be appropriately housed at Logan.

117.    The mental health program at Logan is equipped to deal with prisoners suffering from trauma disorders and gender dysphoria.

118.    Plaintiff would have benefited from being housed at Logan Correctional Center.

119.    Assignment to a women's prison would not only have affirmed Plaintiff's gender identity, but it would have put her in an atmosphere where she would have been protected from ongoing assault and harassment and it would have given her access to mental health services she needed to stay safe.

120.    There was no legitimate penological purpose for IDOC to refuse to house Plaintiff at a women's prison.

121.    At the same time, Plaintiff did not present a risk to other women at Logan Correctional Center.

122.    Plaintiff is not sexually attracted to women.

123.    Although Plaintiff was convicted of violent crimes, the same is true for a significant number of cisgender women currently housed at Logan.

124.    There was no legitimate penological purpose for denying Plaintiff the benefits afforded to cisgender women.

## COUNT I – VIOLATION OF THE EQUAL PROTECTION CLAUSE
### (Fourteenth Amendment Claim for Damages under 42 U.S.C § 1983)

125.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

126.     Count I is alleged against Defendants Director Jeffreys, Dr. Puga, and Dr. Reister.

127.     In the manner described more fully above, by refusing to place Plaintiff in a woman's prison, the Defendants discriminated against Plaintiff on the basis of her gender identity in violation of the Equal Protection Clause of the Fourteenth Amendment.

128.     The actions of the Defendants were the direct and proximate cause of the violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

129.     The Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Plaintiff's clearly established constitutional rights.

## COUNT II – VIOLATION OF THE EQUAL PROTECTION CLAUSE
### (Fourteenth Amendment Claim for Damages under 42 U.S.C § 1983)

130.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

131.     Count II is alleged against Defendants Director Jeffreys, Warden Dennison, Warden Larson, Officer Soria, and Sergeant Hicks.

132.     In the manner described more fully above, Defendants continually subjected Plaintiff to verbal sexual harassment due to her gender identity that male prisoners do not endure. The verbal harassment was so pervasive and ongoing that it constitutes intentional discrimination on the basis of her gender identity.

133.     The actions of the Defendants were the direct and proximate cause of the

violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including pain, suffering, emotional distress, anguish, and humiliation.

134.    The Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Plaintiff's clearly established constitutional rights.

## COUNT III – FAILURE TO PROTECT
### (Eighth Amendment Claim for Damages under 42 U.S.C. § 1983)

135.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

136.    Count III is alleged against all Defendants.

137.    Under settled United States Supreme Court authority, and in accordance with the Eighth Amendment, Plaintiff is entitled to be free from a known and substantial risk of serious harm while in the custody of the State.

138.    In the manner described more fully above, the Defendants were deliberately indifferent to the known and substantial risk of serious harm Plaintiff faced from both prison staff and other prisoners as a transgender woman in a men's prison.

139.    The actions of the Defendants were the direct and proximate cause of the violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

140.    The Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Plaintiff's clearly established constitutional rights.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (State law claim for Damages)

141.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

142.    Count IV is alleged against all the Defendants.

143.    The Defendants' conduct described above was extreme and outrageous.  The Defendants' actions were rooted in an abuse of power and authority, and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

144.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment in her favor against the Defendants in the following manner:

1.    Award Plaintiff compensatory and punitive damages.

2.    Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

3.    Award Plaintiff such other and further relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands trial by jury.


Dated: August 24, 2020

                                        Respectfully submitted,

                                        **TAY TAY**

                                        By: /s/ Vanessa del Valle
                                             One of her attorneys

26

Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
vanessa.delvalle@law.northwestern.edu

Sheila A. Bedi
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
sheila.bedi@law.northwestern.edu

Alan Mills
Nicole Schult
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411
alan@uplcchicago.org
nicole@uplcchicago.org

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that she served the foregoing document upon all persons who have filed appearances in this case via the Court's CM/ECF system on August 24, 2020.

/s/ Vanessa del Valle